**Joseph JONES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 66229.**

Court of Criminal Appeals of Texas, Panel No. 2.

June 24, 1981.

Jacobo G. Munoz, Corpus Christi, for appellant.

William B. Mobley, Jr., Dist. Atty., and Gregory Tella, Asst. Dist. Atty., Corpus Christi, Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

OPINION

DALLY, Judge.

This is an appeal from an order revoking probation. On March 28, 1978, the appellant pled guilty to the offense of delivery of heroin; punishment was assessed at imprisonment for ten years, probated. In January, 1979, the State filed a motion to revoke probation alleging that the appellant delivered heroin to an undercover agent on September 14, 1978, and on October 17, 1978, in violation of the condition of probation that he commit no offense against the laws of this state. On April 20, 1979, the trial court revoked the appellant's probation and he was sentenced to imprisonment for ten years.

In his sole contention appellant urges that the trial court abused its discretion in revoking probation because the evidence is insufficient to show that he twice delivered heroin to an undercover agent. He says the evidence is insufficient because the State failed to establish a chain of custody for the heroin admitted in evidence by the court.

On October 17, 1978, Curtis Hildreth, an undercover narcotics agent, for twenty dollars purchased from the appellant a red balloon that the appellant said contained heroin. Thereafter, Hildreth delivered the balloon to O. A. Benavides, an agent with the County Sheriff's crimes task force assigned to take custody of evidence secured by Hildreth. Benavides marked the balloon with his initials, sealed it in an envelope (State's Exhibit 3A) and delivered it to James Waller, a Department of Public Safety chemist, for analysis. Waller initialed, dated and recorded the laboratory file number L3C–23517 on State's Exhibit 3A, placed it in a locker in the storeroom, and subsequently analyzed the contents of

the balloon inside; he did not mark the balloon, other than with his initials. After such analysis was conducted, a vial (State's Exhibit 3C) containing the residue of heroin was marked with the number L3C–23517, placed together with the balloon (State's Exhibit 3B) inside State's Exhibit 3A and sealed by Waller to be returned to Benavides for trial.

At trial, Waller was unable to *positively identify* State's Exhibit 3B as being the balloon obtained from State's Exhibit 3A since it was not marked with the laboratory file number L3C–23517. The appellant objected that State's Exhibit 3B and 3C were therefore inadmissible urging that the chain of custody was not established during the handling of State's Exhibit 3B at the D.P.S. laboratory.

Although Waller did not positively identify State's Exhibit 3B, the following colloquy occurred as he was being questioned by the State:

"Q. [PROSECUTOR]: I will show you State's Exhibit 3B and ask you if that is what you found inside [State's Exhibit 3A]?

"A. Yes. This has my initials on it. I did not mark it with the laboratory case number.

"Q. Assuming it came out of 3B, would that have been the same evidence that you received?

"A. Yes, sir. Even though I didn't mark it I am extremely careful not to get different things mixed up with different containers.

"Q. What did you find inside 3A?

"A. There was a red balloon. The red balloon had a tin foil package inside of it and there was powder inside the tin foil. The weight of the powder was .05 grams, and it contained heroin—heroin was slightly less than one percent, .9%.

"Q. After conducting the analysis on the powder in the balloon what did you do with the balloon and with any powder that might have been left over?

"A. The records indicate there was no powder left in the original form. It was all used in the analysis, however, some residue that was left was placed in here.

"Q. And you are talking about a vial which has been marked State's Exhibit 3C for identification?

"A. Yes, sir.

"Q. What about the balloon?

"A. The balloon also would have been placed back in the envelope.

"Q. Was the envelope then sealed by you?

"A. Yes, sir.

"Q. What was done with it then?

"A. It was placed back in the storeroom and given to Agent Benavides at a later date.

"Q. Was it given to Agent Benavides in a sealed condition?

"A. Yes, sir."

There is no evidence suggesting that State's Exhibit 3B, which was initialed by both Benavides and Waller, was tampered with or misplaced while at the D.P.S. laboratory. We find that the chain of custody was sufficiently shown for the admission of State's Exhibits 3B and 3C; the appellant's objection would be to the weight rather than the admissibility of the evidence. See *Hicks v. State*, 545 S.W.2d 805 (Tex.Cr.App. 1977); *Salinas v. State*, 507 S.W.2d 730 (Tex.Cr.App.1974); *Montgomery v. State*, 506 S.W.2d 623 (Tex.Cr.App.1974); *Darrow v. State*, 504 S.W.2d 416 (Tex.Cr.App.1974); *Kilburn v. State*, 490 S.W.2d 551 (Tex.Cr. App.1973); *Boss v. State*, 489 S.W.2d 582 (Tex.Cr.App.1972). An object offered in evidence should not be rejected merely because it is not positively identified. *Moore v. State*, 527 S.W.2d 529 (Tex.Cr.App.1975); *Hicks v. State*, 508 S.W.2d 400 (Tex.Cr.App. 1974). We do not reach the appellant's challenges with regard to the other alleged probation violation.

The trial court did not abuse its discretion in revoking probation. The judgment is affirmed.

CLINTON, Judge, dissenting.

This is an appeal from an order revoking probation. Appellant's punishment was assessed at ten years confinement.

Upon his plea of guilty, appellant was convicted of the offense of delivery of heroin and was assessed a ten year sentence; however, imposition of the sentence was suspended and appellant was placed on probation.

Thereafter, the State filed a motion to revoke probation, alleging that appellant had violated the term of his probation that he "commit no offense against the laws . . .," by delivering heroin to Curtis Hildreth on September 14, 1978, and again on October 17, 1978.

On appeal, the sole ground of error asserts that the evidence is insufficient to support the trial court's finding that appellant twice delivered heroin as alleged by the State. Specifically, appellant contends that the State failed to establish, by a preponderance of the evidence, that the substance determined by chemical analysis to be heroin, was in fact the same substance Curtis Hildreth testified he purchased from appellant on each occasion in question. We agree, and accordingly reverse.

At the April 20, 1979 hearing on the motion to revoke, the State called the same three witnesses to establish the "chain of custody" in each transaction: Curtis Hildreth, an undercover narcotics task force agent; O. A. Benavides, an agent with the County Sheriff's crimes task force; and James F. Waller, a Department of Public Safety chemist.

Hildreth testified that on September 14, 1978 he and a woman he characterized as a "female subject"[1] went to an apartment complex looking for someone named "Martie," who was to provide him with heroin. "Martie" directed him and the woman to another apartment where he found appel-

lant and several others, none of whom were acquaintances. While admitting it very unusual, Hildreth testified he was able to easily buy a "paper" of heroin from appellant for $20.00, without saying "Martie" had sent him. Hildreth and his companion then left to meet other task force officers at a prearranged location.

Benavides testified that he accompanied Hildreth from a distance to the Blue Jay Apartments and observed him exit his van and walk toward the buildings. According to Benavides, Hildreth was at all times alone. Benavides later met Hildreth at a prearranged location.

According to Hildreth, he conducted the "field marquis reaction test" on the substance contained in the tinfoil "paper" he obtained from appellant, then provided an envelope which Benavides grabbed from him; Hildreth testified that he observed Benavides put the "paper" inside the envelope, mark the envelope and seal it. Benavides, however, testified that it was *he* who conducted the field reaction test on the powder; he additionally stated that after he placed the tinfoil "paper" in the envelope, he parted from Hildreth, went back to the station and *there* marked the envelope and sealed it.

At any rate, the witnesses did agree that Hildreth *did not* in any manner mark the "paper" he allegedly obtained from appellant. Thus, Hildreth was unable to state with certainty that either the tinfoil "paper" (State's Exhibit[2] 2B) or the envelope (SX 2A) was the same as those involved in the September 14 transaction.[3]

Benavides testified that after he returned to his office, marked and sealed SX 2A, the envelope, he placed it in a locked drawer, to which he possessed the only key, inside a vault. The next day he removed the sealed envelope and delivered it to the Department of Public Safety lab. Though Bena-

---

1. Hildreth identified his companion as Cathy Diaz and stated she was not a police officer.

2. Hereinafter "State's Exhibit" will be signified by "SX."

3. Similarly, Benavides stated that he neither marked the "paper" and conceded that there was "nothing on it to indicate" it was the same "paper" received from Hildreth, though he stated he could identify the envelope.

vides did not remember to whom he handed the envelope, he stated he had to "sign in" for it.

James Waller testified that he received SX 2A directly from Benavides, but according to the chemist, this occurred on October 2, 1978, rather than September 15 as related by Benavides. Waller marked the envelope and "paper," with his initials, the date and a "lab case number," returned the "paper" into the envelope, sealed it, stored it, completed an analysis of the approximately .05 grams of powder contained therein on December 12, 1978, put the remaining powder in a vial (SX 2C), which was placed along with the "paper" back into the envelope, sealed it and stored it until Benavides returned for it.

Analysis revealed the powder contained in SX 2B to be 3% heroin.

As for the transaction alleged to have occurred on October 17, 1978, Hildreth testified that at 11:00 a. m. on that day, he left directly from his home for "work," which that day was "the cut" area of Corpus Christi. Hildreth testified that he did so that day without having met with other officers first, and without a backup team. As he pulled up in his undercover van, got out and started walking across the street, appellant approached him, stating he had "some pretty good pills" and "one paper left" if Hildreth were interested. Hildreth told appellant his money was "funny" and he did not wish to buy anything.[4] He walked into the Little Chicago Club, shot a game of pool and when he came back out, appellant approached him again, saying, "Hey, I just have this one paper. I will let you have it for a good price ... $20.00." According to Hildreth, "I stated, okay. We got in my undercover vehicle and I handed the subject $20.00 and he handed me one tinfoil paper containing a substance be-lieved to be heroin." Hildreth "thought" the paper was inside a balloon. After he dropped appellant off, he contacted officers Benavides and Hill at the Sheriff's Office, and met them at another location where he handed the balloon directly to Officer Hill.[5]

According to Benavides, on October 17, he had prior contact with Hildreth and followed him to "the cut." He observed Hildreth stop and exit his vehicle, and he stayed in the area until Hildreth contacted him by radio. Benavides testified, however, that he at no time saw appellant in the area, and did not observe the alleged transaction.

Again, Hildreth and Benavides each testified it was he who conducted the field test on the substance contained in the "paper;" Hildreth admitted he did not see Benavides mark, but claimed to have observed Benavides seal, the envelope into which the balloon and "paper" were placed, while Benavides testified that, as before, he returned to his office in order to mark and seal the envelope. Hildreth conceded that he could not say that SX 3C was the same envelope into which he observed Benavides place the items he had obtained from appellant. Hildreth was not asked whether he could identify SX 3B, the balloon, except to say that it was "similar" to the one obtained from appellant.

In this regard, Benavides testified thus:

"Q: Was [the balloon Hildreth handed to you] similar to what has been marked for identification as State's Exhibit No. 3B?

A: I can't say it's the same one—oh, I marked this one.[6]

\* \* \* \* \* \*

Q: So you see your initials then on State's Exhibit—

A: Yes, sir, I do.

---

4. When asked what he meant by saying his money was "funny," Hildreth replied, "I meant that I didn't have any money to buy. It was just—I didn't want to buy anything at that point. What little money I had I had something to do with it."

5. After the prosecutor asked Hildreth if looking at his report in this case would refresh his memory, and his affirmative reply, Hildreth remembered it was Benavides to whom he handed the balloon.

6. All emphasis is mine unless otherwise indicated.

Q: So you can testify State's Exhibit 3B is the same balloon that you received from—

A: Yes, I can, because it's got pieces of tape around it *with the date and my initials* on it.

Q: And what is the date?

A: *I can't make out the date.*

Benavides related that after sealing the envelope, he again stored it in a locked drawer until delivering it to Waller at the DPS lab, on an unknown date, to a person unknown.

Chemist Waller testified that he received SX 3A, the sealed envelope, from Benavides directly on December 12, 1978. Waller initialed, dated and recorded a "lab case number" on the envelope, but did not mark SX 3B, the balloon, other than with his initials. He stated that he did not remember whether he personally placed the envelope, SX 3A, and its contents into the storage vault.

On cross examination, Waller clarified that SX 3B, the balloon, was not marked with either a date or "lab case number" corresponding to the number marked on the envelope; he conceded that he could not positively identify SX 3B as the same balloon received by him in that envelope by viewing the balloon "by itself." He further testified that he could not positively state that the other chemist who had access to the evidence storage vault, did not at any time open SX 3A while it was in lab custody, and explained on redirect examination that no business records were kept in his lab relating any intermittent removal of and analysis work on, evidence during the period it is kept there. While informal notes are made of such handling of evidence, Waller had none in his possession relative to SX's 3A or 3B.

The analysis of the approximately .067 grams of powder contained in SX 3B revealed it to contain .9% heroin.

After such analysis was conducted, none of the powder was left, but "residue" of the substance was placed by Waller in a vial, SX 3C. After placing the vial, the "paper"

and the balloon back into the envelope, Waller sealed it, placed it in the lab storeroom and returned it to Benavides at a later date.

Appellant objected to the admission of SX's 2A, 2B, 2C, 3A, 3B and 3C on the ground that no connection between the heroin in the field and that contained in the envelopes had been established.

While the review of the sufficiency of the evidence in this case would have been facilitated had this Court had before us written findings of fact on which the trial court based its decision to revoke appellant's probation,[7] I believe that a careful review of the testimony adduced reveals that agent Hildreth, who allegedly bought heroin from appellant on the dates charged, was unable to establish that either the "paper" (SX 2B) or the balloon (SX 3B) exhibited at trial as having contained heroin, were the same items delivered to him by appellant on the dates charged. *Jones v. State*, 538 S.W.2d 113 (Tex.Cr.App.1976). Though I perceive other material "breaks" in the two chains of custody of the items of contraband, in view of the above failure of proof, we need not discuss them.

The order revoking probation should be reversed, and this cause remanded to the trial. I dissent to the failure of the panel to do so.

---

**7.** The record reflects that appellant failed to request findings of fact and conclusions of law.