**Vernon Ray GILMORE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–81–0267–CR.**

Court of Appeals of Texas,
Amarillo.

Aug. 24, 1983.

Discretionary Review Refused
Jan. 25, 1984.

Hurley, Sowder, Magness & Hurley, Daniel W. Hurley, Lubbock, for appellant.

John T. Montford, Dist. Atty., Jim B. Darnell, Asst. Dist. Atty., Lubbock, for appellee.

Before REYNOLDS, C.J., and COUNTISS and BOYD, JJ.

BOYD, Justice.

Appellant Vernon Ray Gilmore brings this appeal from his conviction of the offense of murder and the consequent court assessed punishment of ninety-nine years confinement in the Department of Corrections. For the reasons hereinafter expressed, we reverse the judgment of conviction.

Appellant presents eight grounds of error for our review. In his first ground, he argues that the trial court erred in refusing to grant his motion for instructed verdict of acquittal because he contends the evidence was insufficient to support the conviction. He asserts, in his second ground of error, that the trial court erred in failing to grant his motion to suppress certain items taken by the police from a motel room without authority of a search warrant since, he contends, the State failed to show by clear and convincing evidence that he had consented to this search.

In his third ground, appellant attacks the lawfulness of his arrest. Arguing that the arrest was unlawful, he attacks the trial court's decision to permit the introduction of evidence obtained subsequent to the arrest on the grounds that the evidence was a fruit of an illegal arrest and search. Appellant's fourth ground concerns the trial court's decision to admit into evidence certain newspaper accounts which were found in appellant's Seattle motel room. He argues that the articles contained impermissible hearsay and that their introduction violated his constitutional right of confrontation. He further contends that these articles were highly prejudicial to his case and that he was thereby denied a fair trial.

In his fifth ground of error, he asserts that the trial court erred in refusing to

grant his motions for mistrial after the State elicited testimony of extraneous offenses from witness Sue Bryan and witness Willis Frankenfield. Appellant argues in his sixth ground of error that the trial court erred in admitting into evidence certain blood samples taken from the body of the deceased because there was allegedly a material break in the chain of custody of the blood samples.

Appellant's seventh ground of error attacks the trial court's decision to permit witness Tom Joyce to testify at the trial. He reasons that the trial court erred in permitting Joyce to testify because the court knew that Joyce would plead the Fifth Amendment on relevant questions which the appellant would want to ask him. The trial court's action, appellant contends, denied him his right of confrontation. Finally, in his eighth ground of error, the appellant alleges that the trial court erred in instructing the jury on the law of parties because there was no evidence to raise the issue of parties.

A brief discussion of the facts of this case reveals that on November 7, 1980, the body of Richard Grier Luster was discovered in a caliche pit east of Lubbock. Luster had died as a result of bullet wounds to his head and chest, both fired at close range. The coroner estimated that Luster died sometime between the afternoon of November 5, 1980 and the early morning of November 6, 1980. Appellant, who had been in the company of Luster on November 4th or 5th, was arrested by United States Customs agents on December 19, 1980 at a border station in Blaine, Washington. Waiving extradition, the appellant returned to Texas on December 31, 1980 to stand trial for the murder of Richard Luster. On August 6, 1981, the jury returned a guilty verdict against the appellant, giving rise to this appeal. Additional pertinent portions of the evidence will be referred to in the discussion of the ground of error to which those facts relate.

We think logical continuity requires that we first address appellant's grounds of error which attack the trial court's decisions to admit certain evidence and testimony into the record. After we have resolved appellant's evidentiary grounds of error, we will discuss appellant's sufficiency of the evidence ground of error. Finally, we will consider appellant's eighth ground of error in which he objected to the court's decision to instruct the jury on the law of parties.

Appellant argues, in his third ground of error, that the trial court erred in permitting the State to introduce testimony and exhibits that were fruits of an allegedly illegal arrest. He contends that the State's warrant of arrest was defective and, therefore, all evidence seized and all statements made as a result of the allegedly illegal arrest should have been excluded.

■ We initially note that all evidence obtained by the State as a result of an accused's illegal arrest is inadmissible at the subsequent trial. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "The exclusionary sanction applies to any 'fruits' of a constitutional violation—whether such evidence be tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention." *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980). In order to determine what evidentiary consequences must follow from the appellant's arrest, we must first determine whether or not the arrest was lawful.

■ As a threshold question in deciding the lawfulness of appellant's detention, we must first determine when he was placed under arrest. "A person is arrested when he has been actually placed under restraint or taken into custody by an officer or person ... arresting without a warrant." Tex.Code Crim.Pro.Ann. art. 15.22 (Vernon 1977). It is not necessary that one be brought to a prison in order for there to be an arrest. An arrest has occurred, within the meaning of Article 15.22, when a person's liberty of movement is restricted or

restrained. *Brewster v. State*, 606 S.W.2d 325 (Tex.Cr.App.1980). Here, we believe, appellant's liberty of movement was initially restricted when he was held by the U.S. Customs Service.

█ Officer Terry Neeley of the U.S. Customs Service testified that he was on duty at the United States-Canada border station in Blaine, Washington when a car containing appellant and two females approached on its way from Canada. When asked to identify themselves, appellant gave Officer Neeley a birth certificate which had the name of Thomas William Gilmore on it. Officer Neeley then asked if he could look at appellant's wallet in order that Neeley could see additional proof of appellant's identification. After receiving the wallet from appellant, the officer took out the driver's license contained in the wallet and noticed that the license had the name Vernon Gilmore and appellant's picture on it. When asked to explain the discrepancy between the name on the birth certificate and the name on the driver's license, appellant told Neeley that the birth certificate was his brother's and that he was holding it because his brother "loses his." Appellant indicated to Neeley that his actual birth certificate was in the wallet and removed the birth certificate for Neeley's inspection. Neeley then asked appellant and his companions to explain why they were coming from Canada. Appellant answered that he was presently unemployed and that he was thinking of moving to Canada and the three of them had just returned from lunch there. Neeley proceeded to enter the identification he had received into the Service's crime computer and received a report of an arrest warrant outstanding against appellant for the murder in question here. At this point, Neeley directed two officers of the Customs Service to search appellant for weapons and he was then taken into custody. We believe that appellant's arrest was effectuated at this point in time.

We must next determine what effect the arrest warrant had on appellant's detention by the Customs Service. The State concedes that the arrest warrant was defective, since it was essentially similar to the one held constitutionally defective in *Green v. State*, 615 S.W.2d 700 (Tex.Cr.App.1980). Since the warrant was defective, if the arrest was lawful its lawfulness must be based on some other grounds.

The United States Supreme Court has stated that where an arrest warrant is issued without a sufficient showing of probable cause, any subsequent arrest made in substantial reliance on this warrant is constitutionally invalid. *Whiteley v. Warden*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971). In *Whiteley*, the warrant in question was based upon an affidavit deficient in the same manner as the affidavit upon which the instant warrant was based, that is, the affidavit did not contain any proof corroborating the informant's tip and no indicia of the informant's reliability. The Court there held the warrant defective but then proceeded to determine whether probable cause existed for the arrest apart from the warrant. It then concluded that no such probable cause existed.

█ We do not believe *Whiteley* stands for the proposition that an arrest is per se unlawful if the arrest warrant is defective. Instead, we think, its teaching is that an arrest may indeed be lawful, notwithstanding the defective arrest warrant, if independent police activity prior to the arrest was able to glean sufficient facts to establish probable cause. The information gathered from this independent police activity must tend to indicate that the defendant is in the process of committing, or has previously committed, a crime. We believe this reasoning is consistent with that of the Court of Criminal Appeals in *Green v. State*, 615 S.W.2d 700, 706–707 (Tex.Cr.App.1980) and *Wood v. State*, 573 S.W.2d 207, 217 (Tex. Cr.App.1978). Therefore, since the arrest warrant in the instant case was defective, we can only conclude that the consequent arrest did not violate appellant's fourth amendment rights if there were sufficient facts known to the police prior to the time of the arrest which would tend to indicate

that the appellant had murdered Richard Luster.

■ Probable cause is shown by probabilities, not certainties, and thus probable cause may exist for an arrest even when the evidence from which the conclusion is drawn is less than that required for conviction. Further, probable cause must be based upon the personal observations of the arresting officers or upon reasonably trustworthy information supplied to them by others. These personal observations or reasonably trustworthy information must be sufficient to convince a man of reasonable caution in believing that an offense had been committed by the individual to be arrested. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). *See also United States v. Avila-Dominguez*, 610 F.2d 1266 (5th Cir.1980). Our examination of the record reveals that the State had the following relevant facts in its possession at the time of the arrest:

1. The deceased's body was found in the late evening of November 7, 1980 in a caliche pit near Lubbock, Texas.

2. An autopsy indicated that the deceased had died as a result of a bullet wound to the head and a bullet wound to the chest, both shots having been fired at close range. The coroner estimated that death occurred sometime between the afternoon of November 5, 1980 and the early morning of November 6.

3. A bullet had been removed from a wall in the apartment of appellant's mother, Oma Lea Gilmore. Mrs. Gilmore told the Lubbock police investigators that appellant had accidentally fired a gun in her apartment on October 26, 1980.

4. Ballistics experts determined that the bullet fired into the deceased's chest and the bullet shot into Mrs. Gilmore's wall were both fired from the same gun.

5. The Lubbock police had questioned Mrs. Gilmore and Timothy Gilmore, the brother of the appellant. Both Mrs. Gilmore and Timothy Gilmore told the police that they did not know where the appellant was.

6. The Lubbock police were unable to discover appellant's whereabouts until the time he was arrested in Blaine, Washington.

In essence, the Lubbock authorities had discovered at the time of appellant's arrest that the appellant had had in his possession, only 10 days prior to the murder, the very same gun which was used to kill the deceased. They further knew that appellant had dropped from sight and that he had stopped visiting his mother and brother.

The United States Customs officials were able to observe appellant prior to his arrest. They first encountered him as he was attempting to drive across the border from Canada. As we explained above, appellant first gave the officer his brother's birth certificate when the officer asked appellant to hand over his own birth certificate. Next, when the officer discovered appellant's true identity by inspecting his driver's license, the appellant offered the explanation that he was carrying his brother's birth certificate because his brother loses his. Appellant then retrieved his own birth certificate from his wallet and handed it over. In essence, the U.S. Customs officers knew, prior to the arrest, that appellant had just traveled from Canada and was attempting to reenter the United States. They had also observed him acting in a suspicious and unusual manner when he was asked for his identification.

■ When there has been at least minimal contact between various police officers, probable cause may emanate from the collective knowledge of the police, though the officer who performs the act of arresting may be far less informed. *United States v. Hawkins*, 595 F.2d 751 (D.C.Cir.1978), *cert. denied*, 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380; *United States v. Agostino*, 608 F.2d 1035 (5th Cir.1980); *United States v. Killebrew*, 594 F.2d 1103 (6th Cir.1979), *cert. denied*, 442 U.S. 933, 99 S.Ct. 2867, 61 L.Ed.2d 302; *Brewer v. Wolff*, 529 F.2d 787

(8th Cir.1976). *See also Dorsey v. State*, 646 S.W.2d 640 (Tex.App.—Fort Worth 1983); *United States v. Roper*, 702 F.2d 984, 989 (11th Cir.1983); *United States v. Burnette*, 698 F.2d 1038 (9th Cir.1983). Here, there was minimal contact between the officers from the United States Customs Service and the Lubbock Police Department: the two services were connected by way of the crime computer. Thus, to determine whether probable cause existed, we believe we may look to the collective knowledge of the Lubbock Police Department and the United States Customs Service. *See Williams v. State*, 621 S.W.2d 609 (Tex.Cr.App.1981); *Colston v. State*, 511 S.W.2d 10 (Tex.Cr.App.1974).

■ After examining that collective knowledge, we conclude that there was sufficient probable cause to justify the arrest. The evidence which indicated that appellant had possessed the murder weapon only days before the murder, combined with the evidence showing that he had stopped seeing his mother in Lubbock after November 5th—the very day or just a few hours prior to the time that the deceased was killed, that he had traveled to Canada soon thereafter, and that he had trouble providing his correct identification to Agent Neeley when he crossed back into the United States on December 19th was sufficient to satisfy the probable cause requirement.

Before we can finally resolve whether or not the arrest was lawful, we must determine whether there were requisites for a lawful arrest other than the probable cause showing. Since appellant was arrested by United States Customs agents in Blaine, Washington, we must decide whether Texas, Washington or United States law determines the lawfulness of the arrest.

■ The United States Supreme Court has stated that in the absence of a federal statute granting or restricting the authority of federal law enforcement officers, the law of the state where the arrest without a warrant took place determines its validity. *United States v. Watson*, 423 U.S. 411, 420 n. 8, 96 S.Ct. 820, 826 n. 8, 46 L.Ed.2d 598 (1976). While our Texas Court of Criminal Appeals has never directly addressed this issue, it has cited with approval the holding of the United States Court of Appeals that "[t]he lawfulness of an arrest by state officers is determined by the law of the state where the arrest takes place, subject to federal constitutional standards." *Warrick v. State*, 634 S.W.2d 707, 709 (Tex.Cr.App.1982), *quoting United States v. Fossler*, 597 F.2d 478 (5th Cir.1979). While the Court of Criminal Appeals did not address the precise question presented here, i.e. an arrest by federal officers, the Court's approach is consistent with that of the Supreme Court's in *Watson*. And while the Supreme Court's holding in *Watson* is not strictly controlling on us because it only concerned the law that should be applied by federal courts and did not discuss the applicability of its holding on state courts, the reasoning used therein is persuasive and should be applied by us. When law enforcement officers need to make an arrest, they should be able to rely on the applicability of the rules and regulations of their own jurisdiction without having to worry about applying the special and peculiar rules of another jurisdiction.

In the instant case, federal statutes do govern the activities of the United States Customs agents. Customs agents are authorized to enforce the various customs laws and, as stated in 26 U.S.C. § 7607, to

(1) carry firearms, execute and serve search warrants and arrest warrants, and serve subpoenas and summonses issued under the authority of the United States, and

(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs ... of marihuana ... where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation.

*See generally* 19 U.S.C. § 1581 *et seq.* However, there is no statute which authorizes the custom agents to arrest persons

suspected of violating state criminal laws. If they had authority to make this warrantless arrest, it must be derived from authority given to them by the jurisdiction in which the arrest took place, *i.e.*, Washington.

◼ We note that neither side attempted to prove the Washington laws of criminal procedure during the course of the trial. In the absence of proof to the contrary, it is presumed that the law of another state is the same as that of this state. *Hall v. State*, 619 S.W.2d 156 (Tex.Cr.App.1980). We shall, therefore, apply Texas law in our determination of the authority of the agents to make the arrest in question.

Since the arrest warrant was defective, the arrest itself can only be held lawful if it complied with both the constitutional and state requirements for a warrantless arrest. *See Lowery v. State*, 499 S.W.2d 160 (Tex.Cr.App.1973). The constitutional requirement, as we explained above, is that the officers making the arrest have probable cause to believe that the suspect has committed an offense. For the reasons expressed above, we believe the Customs agents had such probable cause. Thus, the question which we must now consider is whether or not the officers complied with Texas law in making their warrantless arrest.

The provisions of the Texas Code of Criminal Procedure which govern warrantless arrests are Articles 14.01–14.06. For the purposes of this case, Article 14.04 is relevant. Article 14.04 details the authority of peace officers to make a warrantless arrest. For the reasons detailed below, we conclude that the United States Customs officers complied with the Texas law and thus appellant's arrest was lawful.

◼ While United States Customs Service Agents are not deemed to be peace officers, they have been given the power of arrest, search and seizure as to felony offenses under the laws of Texas. Tex.Code Crim.Pro.Ann. art. 2.12 (Vernon Supp. 1982). The Court of Criminal Appeals has never indicated whether United States Customs agents have the same authority as

Texas peace officers to make warrantless arrests. Specifically, the Court has never determined whether U.S. Customs agents are authorized, as Texas peace officers are, to make warrantless arrests under Article 14.04.

In the only case in which the Court of Criminal Appeals was presented with the problem, the court resolved the case on narrow grounds and thus deferred resolution of the issue presented here. In *Sanchez v. State*, 582 S.W.2d 813 (Tex.Cr.App. 1979), cert. den. 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728, the defendant was spotted driving his automobile at a high rate of speed by two United States Border Patrol agents. The agents gave chase but were unable to catch the defendant. A few minutes later, the agents drove up to the defendant's automobile which was parked on the side of the road. The defendant was at the front of the car checking under the hood. Noticing that the defendant appeared intoxicated, the agents detained the defendant. When they asked the defendant if he would permit them to search his automobile, he refused. Thereupon, the agents contacted the Sheriff's Department. While waiting for the sheriffs to arrive, the agents permitted the defendant to sit in the automobile in order that he could keep warm. When the car door was opened, the agent smelled an odor which he believed to be marijuana. The agent then arrested the defendant.

At the subsequent trial, the defendant argued that the agents' authority to make arrests was limited to suspected violations of U.S. immigration laws and did not extend to suspected violations of Texas criminal law. Consequently, he reasoned, since this arrest was made because the agent suspected that the defendant had violated Texas law, the agent acted beyond his authority and thus the arrest was unlawful.

The Court of Criminal Appeals held that arrest lawful. Without deciding whether the United States Border Patrol agents had the same powers to make warrantless arrests as Texas peace officers are given under Article 14.04, the Court concluded

that this warrantless arrest was justified under Article 14.01 which permits private citizens as well as peace officers to make such arrests when the offense is committed in their direct presence.

■ In the instant case, since the Customs agents did not see the alleged murder themselves, their arrest could not have been authorized by Article 14.01. However, Article 14.04 authorizes "peace officers" to make warrantless arrests without being witnesses to a crime in certain limited circumstances. No such authority is given to private citizens. Therefore, unless the Customs agents be considered as "peace officers" within the purview of the Code of Criminal Procedure, they would not have been authorized to make the arrest.

■ Article 2.12 defines who is a peace officer in this state. Originally, this article did not include United States law enforcement officers within the definition of "peace officers." However, in 1977 the statute was amended to provide that Customs agents, although not peace officers of the State, shall have "the powers of arrest, search and seizure as to felony offenses only under the laws of the State of Texas." It is our view that this 1977 amendment was intended to and did confer the same authority to arrest, search and seize on these federal officers as that already conferred on Texas peace officers.

■ Art. 14.04 provides that if a peace officer has been given satisfactory proof upon the representation of a credible person that a felony has been committed and that the offender is about to escape, so that there is no time to procure a warrant, then he is authorized to make a warrantless arrest. In essence, the officer must have had the legal equivalent of constitutional probable cause to believe that the suspect has or is about to commit a felony. *Earley v. State*, 635 S.W.2d 528 (Tex.Cr.App.1982). The officer must also have had a reasonable belief that the suspect. was about to escape and that there was no time to procure a warrant. *Earley v. State, supra.*

If either probable cause or the exigent circumstance of escape is not shown, then the warrantless arrest is not authorized under this article. *Hardison v. State*, 597 S.W.2d 355 (Tex.Cr.App.1980). *See also Grabow v. State*, 646 S.W.2d 953, 956 (Tex. App.—San Antonio 1983).

In the instant case, we have already detailed at some length the information obtained from the initial Lubbock police investigation as well as the direct observations made by the Customs agents of appellant's suspicious behavior at the border. We think this sufficient to establish the requisite constitutional probable cause.

■ In accordance with the strict construction given exceptions allowing warrantless arrests, in addition to probable · cause, the record must show clearly that the person arrested was about to escape. Inarticulate hunches and suspicions are not enough to justify the arrest. *Honeycutt v. State*, 499 S.W.2d 662 (Tex.Cr.App.1973). In making this determination, we must consider the factors of appellant's suspicious behavior when identification was requested as well as the agent's knowledge of the outstanding warrant. In addition, we note that appellant was in a motor vehicle on a public street, a factor which may be considered in determining exigent circumstances. *See Hardison v. State*, 597 S.W.2d 355 (Tex.Cr.App.1980). Considering the totality of the circumstances, we believe a sufficient showing of exigent circumstances was made.

■ We recognize that the arrest warrant in question later proved to be defective. However, nothing in the record indicates the customs agents should have had any reason to suspect its invalidity and, absent such notice, they were entitled to rely upon its supposed validity. *See Colston v. State*, 511 S.W.2d 10 (Tex.Cr.App. 1974); *Hooper v. State*, 516 S.W.2d 941 (Tex.Cr.App.1974).

Since the arrest satisfied the requirements of art. 14.04, and since we must presume the Washington law to be the same as that of Texas, we conclude that

the arrest was justified under the law of the jurisdiction where made.

■ In his second ground, appellant argues that the trial court erred in failing to grant his motion to suppress items seized in a warrantless search of his Seattle motel room since, he says, the State failed to meet its burden of proving his consent to the search. It is axiomatic that the Fourth Amendment forbids the government from conducting unreasonable searches of its citizens. However, to claim its protection an individual must show a reasonable expectation of privacy that has been invaded by government action. *United States v. Knotts,* — U.S. —, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983).

■ The inquiry into this reasonable expectation normally embraces two separate questions. The first is whether the individual, by his conduct, has shown that "he seeks to preserve [something] as private." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516.

■ A transiently occupied room in a motel falls within the scope of the Fourth Amendment's protections against unreasonable search and seizure, *United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), and appellant's conduct in shutting his room upon leaving, etc., indicated he sought to keep the articles in his room private. As *Jeffers* indicates, this expectation of privacy is legitimate and reasonable. Therefore, we think, the police entry into appellant's room amounted to a search within the purview of the Fourth Amendment.

■ The basic premise in any warrantless search case is that such a search is per se illegal. However, one of the well recognized exceptions to this rule is that a person may consent to a warrantless search. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The consent must be voluntary and the State has the burden of proving the voluntariness of the consent. *Florida v. Royer,* — U.S. —, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The voluntariness of the consent must be shown by clear and convincing evidence. *Bumpers v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

■ The question of whether or not a consent is voluntary is one of fact that may be decided initially by the court, in ruling on the admissibility of evidence obtained by the search, and ultimately by the jury. *See Oliver v. State,* 414 S.W.2d 679 (Tex.Cr.App.1967). Appellant did not request that the issue of the voluntariness of his consent be submitted to the jury and, therefore, our inquiry is limited to the propriety of the admission by the court of the evidence from the motel room.

■ The trial judge is the sole fact finder at a hearing on a motion to suppress evidence obtained in a search and, as such, he may choose to believe or disbelieve any or all of a witness' testimony. *Taylor v. State,* 604 S.W.2d 175 (Tex.Cr.App.1980). The trial court has broad discretion in determining the admissibility of the evidence and the appellate court will not reverse unless a clear abuse of discretion is shown. *Williams v. State,* 535 S.W.2d 637 (Tex.Cr. App.1976). For the reasons explained below, we conclude that the trial court did not abuse its discretion by admitting the evidence taken from appellant's motel room.

■ The record indicates that, after his detention by the Customs Service, appellant was interviewed on December 22, 1980 by agents Rockom and Gately. During the interview, appellant indicated he was worried about the safety of his property in the Seattle motel room. Agent Rockom testified that he told appellant the government would secure his goods for him and that, upon being so informed, appellant wrote down for the convenience of the agents the name of the hotel, the address, the room number and the name under which he had registered for the room. Appellant testi-

fied that, to the contrary, he had only given his friend Amanda Witt permission to pick up the items, and that Gately had agreed to this. However, the trial court evidently accepted the testimony that appellant had given his consent to the police entry in the motel room and the subsequent appropriation of his property. As the fact finder on the motion to suppress, the trial judge was entitled to believe Rockom and disbelieve appellant. For the purposes of this appeal, we must therefore assume appellant agreed to the entry by the agents in his motel room to secure his property.

■■■■ Appellant contends, and we agree, that his giving permission to secure his property was not the equivalent of a consent to a full investigatory search. However, the testimony of Sergeant Schenffele and Detective Plumb, the officers who conducted the search, is sufficient to sustain the State's burden of showing the search did not exceed the scope of appellant's consent. Their testimony, evidently accepted by the trial court, was that the purpose of entry into the room was to safeguard appellant's valuables and that their activities, after entry, were limited to gathering and packaging appellant's belongings. We therefore believe the evidence obtained from appellant's Seattle motel room was not obtained in violation of appellant's constitutional rights and the trial court did not abuse its discretion in receiving these items in evidence. *See Sutton v. State*, 519 S.W.2d 422 (Tex.Cr.App. 1975). Our conclusion in this respect is reinforced by the reasoning of the court in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), since the obligations and responsibilities of the police in this situation were analogous to those of the police in the inventory situations described in that opinion.

Appellant argues, in his fourth ground of error, that the trial court erred in admitting newspaper accounts of the murder investigation into evidence over appellant's objection because these newspaper accounts allegedly constituted unsworn hearsay testimony and that by admitting the newspaper accounts, the trial court violated his right of confrontation, guaranteed by the sixth amendment to the U.S. Constitution.

■■■■ The trial court, as we pointed out above, has broad discretion in determining the admissibility of the evidence and the appellate court will not reverse unless a clear abuse of discretion is shown. *Williams v. State, supra*. However, the admission of prejudicial inadmissible hearsay would constitute an abuse of discretion and reversible error. *See Elder v. State*, 614 S.W.2d 136 (Tex.Cr.App.1981). We must therefore determine if the newspaper accounts introduced into evidence constituted hearsay.

■■■■ "Hearsay" is evidence of a statement made out of court which is offered for the purpose of proving the truth of the statement. *Girard v. State*, 631 S.W.2d 162 (Tex.Cr.App.1982). It follows, of course, that the statement is not hearsay if it is offered for some purpose other than for its truth. *Arnott v. State*, 498 S.W.2d 166 (Tex.Cr.App.1973). We conclude that the newspaper articles in question in this case were not admitted for the truth of the matter asserted and thus their admission into evidence did not violate the hearsay rule.

The newspaper articles which the police found in appellant's Seattle motel room were from the Lubbock Avalanche-Journal and they detailed several aspects of the Luster murder investigation. A November 10, 1980 clipping contained a short reference to the fact that a warrant for appellant's arrest had been issued by the Justice of the Peace and that an award was being offered for information leading to his arrest. The police also found a clipping from the November 12, 1980 edition of the Avalanche-Journal which ran a story under the headline "Gangland Slaying Seen in Death Here." This November 12 story described in great detail the discovery of Luster's body and the subsequent police investigation into his apparent murder. The article mentioned the Lubbock authorities' belief that the murder "may have been a gangland-style execution prompted by a dispute

over a large amount of money." The article further noted that $1,500 had been found by the Lubbock police in Luster's baggage, which he had left behind in his hotel room. Finally, the article stated that the police were on the lookout for a white man and woman, both in their early 30's, who, it was believed, may have fled the Lubbock area in Luster's automobile. The police also found clippings from the November 13, 15 and 16 editions of the Avalanche-Journal, all detailing aspects of the Luster murder story. The stories described Luster's past involvement with appellant and Samantha Davidson, including the police's discovery of several snapshots of appellant, Davidson and Luster.

Appellant is correct in his contention that the articles would be hearsay if they had been admitted to show the truth of the assertations contained therein. However, as the Court of Criminal Appeals stated in *Beltran v. State*, 593 S.W.2d 688 (Tex.Cr. App.1980):

> An extrajudicial writing may be admitted as circumstantial evidence from which an inference may be drawn, and not for the truth of the matter stated therein, without violating the hearsay rule.

The fact that appellant had the articles in his possession in his Seattle motel room would indicate that appellant knew about and was interested in the murder story. His interest in the case constituted some probative evidence that he may have been responsible for Luster's death. *See Kuykendall v. State*, 609 S.W.2d 791 (Tex.Cr. App.1980). Moreover, the trial court expressly instructed the jury that the only purpose for which they might consider the articles was as evidence of what was found by the police in appellant's motel room and that they should not consider the articles for the truth of the matters asserted therein. Since the articles were received for a purpose other than for the truth of the matter asserted therein and in view of the limiting instruction given by the court upon their receipt, we conclude their receipt did not constitute a violation of the hearsay rule.

■ Appellant also contends that the sensational tone of the articles made the articles in question highly prejudicial and that the limiting instruction given was not sufficient to cure the error in admission. With this contention we are compelled to agree.

Several of the articles in question are headlined " 'Gangland' Slaying Seen in Death Here." There are numerous references to statements that the killing may have involved "big money" and that the murder "strongly resembles classic gangland-style executions." The newspaper articles contained many dramatic, speculative and conclusionary statements of fact that no witness testified to in the trial. After deliberating only a short while, the jury requested only the newspaper articles and photographs be sent into the jury room and returned a verdict shortly after receiving the items requested. Given the exception under which they were admitted, the articles, devoid of proof of reliability or competency of source, were so prejudicial in violating appellant's Sixth Amendment right to confrontation and his Fourteenth Amendment right to cross-examination that the prejudice outweighed any probative value they otherwise had. We believe their admission to be so harmful as to require reversal. See and compare *Porter v. State*, 578 S.W.2d 742 (Tex.Cr.App.1979); *Oliver v. State*, 551 S.W.2d 346 (Tex.Cr.App.1977); *Gamble v. State*, 509 S.W.2d 355 (Tex.Cr. App.1974); *Barber v. State*, 481 S.W.2d 812 (Tex.Cr.App.1972); *Brooks v. State*, 475 S.W.2d 268 (Tex.Cr.App.1972).

In his fifth ground, appellant claims error in the failure of the trial court to grant his motions for mistrial after the State allegedly "elicited testimony of extraneous offenses from the witnesses' Sue Bryan and Willis Frankenfield.

■ In consideration of this ground, we note initially that in both instances the judge promptly sustained objections to the proffered testimony and instructed the jury to disregard the questioned references. Generally, an error in asking an improper question or in admitting improper testimo-

ny may be cured or rendered harmless by a withdrawal of such testimony and an instruction to disregard the same except in extreme cases where it appears that the evidence is clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds. *Davis v. State*, 645 S.W.2d 817, 818 (Tex.Cr.App.1983). Specifically, testimony referring to or implying extraneous offenses allegedly committed by a defendant may be rendered harmless by an instruction to disregard in all but the most extreme situations. *Aliff v. State*, 627 S.W.2d 166 (Tex.Cr.App.1982); *Thompson v. State*, 612 S.W.2d 925 (Tex.Cr.App.1981).

 When Sue Bryan was called as a witness, outside the presence of the jury, the court conducted a hearing as to the admissibility of her testimony concerning appellant's attempted use of a credit card belonging to one Charles Norris. As a result of the hearing, the Court instructed the State not to elicit testimony concerning the name "Norris." After return of the jury and during examination by the State, Ms. Bryan testified that, because appellant and his companion were acting strangely, she took their car license number. She further testified, under questioning by the State, as follows:

Q. And did they say—what did they say with regard to gardenias, when you couldn't produce them?

A. Well, since they couldn't use their card they were using, they didn't—

At this point, she was interrupted by the objection which was sustained, and the questioned instruction given.

Willis Frankenfield, who was a car rental agency operator, testified that he had rented a van to appellant. When asked by the prosecution, "well, did you ever find that van," he replied, "No sir, I never got that one back." This testimony, appellant argues, implied that the appellant had stolen the van. Appellant's attorney duly objected to this testimony.

Assuming arguendo that the Bryan and Frankenfield testimony in question was sufficient to constitute improper references to extraneous offenses, we do not believe it to be so highly prejudicial that the trial court's prompt instruction to disregard was not sufficient to cure or render harmless the error. Appellant's fifth ground of error is overruled.

Appellant, in his sixth ground of error, argues error in the admission into evidence of two vials of blood allegedly taken from the body of the deceased. The vice, he reasons, is that it is a reasonable inference that the blood was drawn by one Robert Wenett who did not testify. Without Wenett's testimony, he contends, there is nothing to show the blood was in fact drawn from the body of the deceased. We do not agree.

Dr. John P. Ray, assisted by Robert Wenett, performed an autopsy on November 8, 1980. Dr. Ray testified that initially he did not know the identity of the body but he later learned the body was that of the deceased Richard Luster. He identified pictures of the body upon which the autopsy was performed. The body in these pictures is readily identifiable as the same as the body in pictures identified by the deceased's father, Herbert Richard Luster, and by Deputy Sheriffs Bohannon and Gas as being that of Richard Luster. The evidence is sufficient to establish that Dr. Ray performed the autopsy on Richard Luster's body.

 A physician can testify as to the results of a test by another person where the test was under his supervision or control. *Caballero v. State*, 587 S.W.2d 741 (Tex.Cr.App.1979), appeal after remand 590 S.W.2d 714 (Tex.Cr.App.1980). Dr. Ray was questioned during cross-examination about the details of the autopsy and, during this exchange, he was asked who precisely drew the blood from the deceased's body:

Q. ... Can you tell me who drew this blood from the victim's body?

A. Well, when we drew the blood, I am going to say I drew it, with this qualification: I have an autopsy assistant, Robert

Wenett, who helps me. Now, one of us would have been holding the heart while the other one drew the blood, or vice-versa.

Q. Okay.

A. But in order not to have to get him to come down, I will say I drew it. I was right there with my hand on the heart.

Q. Well, this is kind of an important point here.

A. I think in this instance I had the syringe.

When questioned further about who actually withdrew the blood sample, Dr. Ray continued:

A. Well, one or the other of us drew it at the same time, together.

Dr. Ray's testimony reveals that while he may not have personally withdrawn the blood, he clearly participated in and directly supervised over the entire procedure. There is no question, therefore, that Dr. Ray can testify about the withdrawal of blood from the deceased during the autopsy.

▮ The blood withdrawn from the deceased was placed in a glass vial which apparently was labeled by Mr. Wenett initially as "unknown" and later, when Wenett discovered the identity of the deceased, as "Richard Luster." Wenett then delivered the vial to Margaret Locke, the toxicology technician, for chemical analysis. Dr. Ray did not see Wenett deliver the vials to Locke. In essence, the appellant asserts that it was conceivable that Wenett could have gotten the vials mixed up with other vials. However, this ignores the fact that Dr. Ray saw the vial when it was simply labeled "unknown." The vial offered as evidence at trial, had the word "unknown" crossed out but clearly legible. Thus, Dr. Ray was in a position to readily identify the vial as being the one he had observed during the autopsy.

The State's failure to show this portion of the chain of custody does not preclude admitting the vial into evidence where, although Dr. Ray did not actually see Wenett take the vial to Margaret Locke, he was able to readily identify it. *Hackbarth v.*

*State,* 617 S.W.2d 944 (Tex.Cr.App.1981). *See also Hinton v. State,* 626 S.W.2d 781 (Tex.Cr.App.1982). Moreover, there was no evidence suggesting that the blood sample was tampered with or misplaced after it left Dr. Ray's sight. Given that Dr. Ray could readily identify the vial and that there was no evidence suggesting any tampering with the sample, we conclude that the trial court acted properly in admitting the blood samples into evidence. *See Jones v. State,* 617 S.W.2d 704 (Tex.Cr.App.1981). Appellant's sixth ground of error is overruled.

In his seventh ground of error, the appellant argues that the trial court erred in permitting State's witness Tom Joyce to testify because the court knew that Joyce would plead the Fifth Amendment on relevant questions which the appellant would want to ask him. Appellant contends that the trial court's decision to permit Joyce to testify, despite Joyce's intention to plead the Fifth Amendment, denied appellant his right of confrontation.

The State sought to call Tom Joyce as a witness. Joyce's testimony concerned his involvement with appellant, the deceased and Samantha Davidson on November 4 and 5, 1980. Apparently, Joyce had been involved in various unlawful activities, including drug smuggling, though he had not been prosecuted for these activities. Joyce informed the prosecutor that he had engaged in several drug operations with appellant. Fearful that he could be prosecuted if he admitted these drug activities, Joyce was reluctant to testify. The prosecutor offered Joyce immunity from prosecution if he would testify about his Lubbock County activities. The offer of immunity, however, did not extend to his non-Lubbock County activities. Joyce accepted this offer and agreed to testify about appellant's involvement with the deceased.

Appellant filed a motion in limine with the court asking that Joyce not be permitted to testify. In essence, appellant claimed that, under the immunity agreement, Joyce would be free to testify about his Lubbock County activities but that he

would likely refuse to answer any questions concerning his non-Lubbock County activities, asserting his Fifth Amendment right against self-incrimination. Appellant argued that he needed to question Joyce about certain of his non-Lubbock County activities in order to show Joyce's bias and animus against the appellant and his motive for testifying. After a lengthy hearing, during which Joyce was extensively questioned about his involvement in unlawful activities with appellant and others, the trial court agreed to permit Joyce to testify.

Immediately prior to the time that Joyce was to be called as a witness, the prosecutor approached the bench and informed the judge that he was planning to object if the appellant's counsel questioned Joyce about any prior acts of misconduct on the part of Joyce because these prior acts of misconduct were irrelevant to the issues presented in the case at bar and because appellant's counsel knew that Joyce was going to plead the Fifth Amendment on all non-Lubbock County activities. Appellant's counsel renewed his contention, initially made at the motion in limine hearing, that he needed to question Joyce about these activities in order to show the motive for his testimony. The court indicated that it would decide whether to permit questioning into the objected to areas at the time the matter was brought up during the questioning.

Joyce took the stand and was questioned by both the prosecutor and appellant's counsel. However, neither side interrogated Joyce about his various drug activities. Consequently, Joyce never asserted his Fifth Amendment right against self-incrimination and the court was never asked, during this questioning, to rule on the admissibility of Joyce's testimony.

■■■■ To preserve error for review by an appellate court, the denial of a motion in limine is not sufficient. *Basham v. State*, 608 S.W.2d 677 (Tex.Cr.App.1980). A defendant must object on the proper grounds when the evidence is offered at trial. *Romo v. State*, 577 S.W.2d 251, 252 (Tex.

Cr.App.1979). In the case at bar, Joyce was never questioned at the trial about his non-Lubbock County activities. The defense counsel obviously, did not object to Joyce's refusal to answer questions concerning these activities since Joyce was never asked any questions about them in the first place. Consequently, nothing was preserved for review. Appellant's seventh ground of error is overruled.

Having disposed of appellant's second, third, fourth, and seventh grounds of error, logical continuity now permits us to rule on appellant's first ground of error, which attacks the sufficiency of the evidence to support the conviction. For the reasons explained below, we conclude that the evidence was sufficient to support the conviction.

■■■■ Although the State in the instant case relies upon circumstantial evidence to sustain the conviction, a review of the evidence must be made in a light most favorable to the jury's verdict. *Phipps v. State*, 630 S.W.2d 942, 944 (Tex.Cr.App. 1982). The jury is the exclusive judge of the facts, the credibility of witnesses, and the weight to be afforded the testimony. *Vanderbilt v. State*, 629 S.W.2d 709, 716 (Tex.Cr.App.1981), *cert. den.* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1982).

■■■■ Circumstantial evidence suffices to support a conviction only if the inferences arising therefrom prove the fact in question beyond a reasonable doubt. The jury should consider the totality of the direct or circumstantial evidence and the reasonable inferences which may be drawn therefrom, in determining whether it was sufficient to establish guilt beyond a reasonable doubt. *Hankins v. State*, 646 S.W.2d 191, 199 (Tex.Cr.App.1981) (opinion on rehearing).

In explicating the rule in *Hankins*, the Court of Criminal Appeals has recently stated that circumstantial evidence should not be tested by an *ultimate* standard for review different from that of direct evidence but that the standard in both kinds of cases should be whether "any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Carlsen v. State,* 654 S.W.2d 444 (Nos. 07–82, 63863, 63987, 62561, slip op. Tex.Cr.App., July 20, 1983, opinion on motions for rehearing). Prior to Hankins, it had been repeatedly stated that a conviction based upon circumstantial evidence could not be sustained on review unless the circumstances excluded every reasonable hypothesis except of the guilt of the defendant. *Vanderbilt v. State, supra.* In *Wilson,* we believe, the court suggested application of this analysis for applying the standard for review in circumstantial evidence cases and it is in the light of this teaching that we review the evidence in this case.

 In applying this analysis, proof amounting to no more than a strong suspicion of guilt would not be sufficient to permit the appellate court to uphold the conviction. *Vanderbilt v. State, supra.* Nevertheless, it is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion of guilt is warranted by the combined and cumulative force of all the incriminating circumstances. *Id.* Further, the rules of circumstantial evidence do not require that the circumstances exclude to a moral certainty every hypothesis that the offense may have been committed by another person. The defensive hypothesis must be a reasonable one, consistent with the facts proved and the circumstances, and the premise that the offense may have been committed by another person must not be out of harmony with the evidence. *Id.* Finally, mere presence at the scene of a crime is not sufficient to support a conviction, but it is a circumstance which, combined with other facts, may suffice to show that the accused was a participant. *Ortiz v. State,* 577 S.W.2d 246 (Tex.Cr.App.1979). With these principles in mind, it is necessary to review the evidence in the instant case.

 The State's evidence, which the jury could believe, can be summarized as follows:

1. Richard Grier Luster purchased a green 1976 Buick Riviera on October 25, 1980 from Roy Blanchard, a Lubbock used car dealer. Luster, accompanied by a blonde woman, returned to pick up the car on November 4, 1980.

2. Later that same day, Luster drove to the Lubbock airport in his green Buick Riviera, accompanied by Tom Joyce and Samantha Davidson, a blonde woman. The three of them picked up the appellant who had just flown in to Lubbock from Austin.

3. The appellant borrowed a 1977 Plymouth from his mother, Oma Lea Gilmore, on the evening of November 4, 1980 and did not return it to her until the late evening of November 5, 1980. He drove to her house on the morning of November 5th, in order to drive her to work, but she decided to ride with a co-employee that morning. Mrs. Gilmore told her son that he didn't have to drive her to work that morning since she already had a ride. The appellant telephoned Mrs. Gilmore at about 5:30 p.m. on November 5th and told her that he would be unable to pick her up at work because he had to take Samantha Davidson to the airport.

4. The appellant returned Mrs. Gilmore's car at about 10:00 p.m. on November 5, 1980. Mrs. Gilmore testified that the appellant told her at that time that he believed that Luster was in a great deal of trouble due to a debt that he (Luster) was unable to pay. Appellant indicated to his mother that he believed that certain persons were trying to get to Luster and that they would try to reach Luster through him. Claiming that he feared for his own safety, the appellant told Mrs. Gilmore, according to her testimony, that he was going to leave Lubbock. Mrs. Gilmore stated that she did not see the appellant again until after his arrest.

5. Luster's body was found, in the late evening of November 7, 1980, in a caliche pit near Lubbock, Texas.

6. The autopsy indicated that Mr. Luster had died as a result of a bullet wound to the head and a bullet wound to the

chest, both shots having been fired at close range. The coroner estimated that death occurred sometime between the afternoon of November 5, 1980 and the early morning of November 6. Both shots hit Luster on the left side of his body.

7. A bullet had been removed from a wall in Mrs. Gilmore's apartment by the Lubbock police. Mrs. Gilmore told the police investigators that the appellant had accidentally fired a gun in her apartment on October 26, 1980. Ballistics experts determined that the bullet shot into Mrs. Gilmore's wall and the bullet fired into Luster's chest were both fired from the same gun.

8. When Tom Joyce visited the appellant at the Hilton Hotel in Lubbock on November 5, 1980, he observed that appellant had in his possession a large caliber black revolver.

9. Diana Cavosos, a maid at the Hilton Hotel, testified that when she was cleaning appellant's hotel room at the Hilton on November 5, 1980, she observed a dark pistol on the top of the dresser inside a green bag.

10. Vicki Harp, the manager of Mrs. Gilmore's apartment complex, testified that on November 11, 1980, she saw appellant's brother and another man removing objects from Mrs. Gilmore's Plymouth, including a revolver.

11. Deputy Don Gas related a conversation he had with the appellant on January 1, 1981, soon after the appellant was brought back to Texas. According to Deputy Gas' testimony, the appellant told Gas that on November 5, 1980, he had borrowed his mother's car and had driven it to the Hilton Inn in Lubbock, where he met with the deceased. The appellant told Deputy Gas, according to Gas' testimony, that later in the afternoon of November 5, he loaned his mother's car to the deceased. Gas testified that the appellant indicated that this was the last time that he saw the deceased. Appellant claimed, according to Gas, that later that same day, he saw the car parked in the parking lot of the Carriage House Motel in Lubbock. Appellant said that he was with Samantha Davidson at the time that the car was spotted. When he went to examine the car, the appellant said that he saw blood inside as well as a bullet lodged in the center post on the right side of the car. He then dug the bullet out of the center post, discarded it, and brought the car to a car wash where he attempted to wash off the blood from the car's interior. The appellant explained to Deputy Gas that he feared that there had been foul play in the car and he did not want to get involved.

12. The Lubbock investigators obtained a search warrant for Mrs. Gilmore's Plymouth on January 2, 1980. They confirmed that the center post on the right side was busted. They removed the right side door panel and the department chemists extracted a small amount of dried blood from the rubber lining of the window. Burgess Cook, a department chemist, testified that he found a small amount of lead on the portion of the center post which was busted, a finding consistent with the State's theory that a bullet had been fired into the center post. Further, Dr. Cook testified that the blood type of the blood scraped from the car was the same as the deceased's—O positive.

13. A blonde woman checked into the Carriage House Motel in Lubbock sometime between 10:00 p.m. and 11:00 p.m. on November 5, 1980, according to Jean Walden, the employee at the desk at that time. The woman registered under the name "R. Greer", a name which is very similar to the deceased's first and middle names. The woman was assigned Room 110 in the motel. Deputy Gas testified that one of the items found on the deceased's body was a key to Room 110 of the Carriage House Motel. Deputy Gas further testified that he went to Room 110 after he found the key and noted that it appeared that no one had ever stayed in the room. The coroner had established that the deceased had died sometime between the afternoon of No-

**156**

vember 5, 1980 and the early morning of November 6.

14. After Richard Luster's murder, the appellant and Samantha Davidson left Lubbock and during the course of the next six weeks made their way to the United States-Canada border. Dennis Carter testified that he saw the appellant and Davidson on November 7, 1980 in Roundrock, Texas and that the appellant was driving Luster's green Buick. Also on November 7th, Willis Frankenfield saw appellant and a female companion at his car rental agency in Austin. The appellant brought back a car he had previously rented from Frankenfield. Frankenfield testified that either appellant or the woman drove a green Riviera to his rental agency and that after appellant had returned the rented car, he and the woman departed in the Riviera. Frankenfield saw the appellant again on November 11, 1980, at which time the appellant rented a van from him.

15. As previously explained, appellant initially gave the border agent the wrong identification and acted in an evasive manner when questioned about his identity and his purpose for crossing the border.

We think the cumulative force of all the incriminating circumstances sufficient for the jury, as the trier of the facts in this case, to conclude, as it did, that appellant was guilty beyond a reasonable doubt of the offense with which he was charged. *See Easley v. State*, 564 S.W.2d 742 (Tex. Cr.App.1978) *cert. denied*, 439 U.S. 967, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978). Appellant's first ground of error is overruled.

In his last ground of error, the appellant asserts that the trial court erred in instructing the jury on the law of parties because there was no evidence to raise this particular issue and, since the question likely will arise again on retrial, it is necessary to discuss this contention.

 It is necessary, in felony cases, to give instructions which are applicable to every legitimate deduction from the facts. *Williams v. State*, 605 S.W.2d 596 (Tex.Cr. App.1980). If facts adduced at the trial

raise the issue and a charge on such issue is properly requested, then a charge on that issue must be given. *Day v. State*, 532 S.W.2d 302 (Tex.Cr.App.1976). If the evidence introduced upon the trial of the cause shows or simply raises an issue, that the conduct of the defendant then upon trial is not sufficient, in and of itself, to sustain a conviction, then the State's case rests upon the law of parties and is dependent, at least in part, upon the conduct of another. In such a case, the law of parties must be submitted and made applicable to the facts of the case. *Eastman v. State*, 636 S.W.2d 272 (Tex.App.—Amarillo 1982, pet. ref'd). *See also McCuin v. State*, 505 S.W.2d 827 (Tex.Cr.App.1974). We must, therefore, determine whether the facts adduced at trial raised the issue that appellant may have acted as a party in committing the murder.

 The court instructed the jury on the law of parties as follows:

All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his/her own conduct, by the conduct of another for which he/she is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he/she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

Mere presence alone will not constitute one a party to an offense.

The court's instruction essentially follows the statutory definitions of § 7.01 ("Parties to Offenses") and § 7.02 ("Criminal Responsibility for Conduct of Another") of the Texas Penal Code. Though the indictment did not allege that appellant acted with others, it is proper for the court to charge the jury on the law of parties as long as the evidence presented at trial raised the issue. *English v. State*, 592 S.W.2d 949 (Tex.Cr.App.1980), *cert. den.* 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120.

In making the determination whether there was sufficient evidence indicating that appellant had acted together with others to commit the murder, direct evidence that they acted together is not required; circumstantial evidence can be sufficient. *Morrison v. State*, 608 S.W.2d 233 (Tex.Cr.App.1980). We can look to the evidence touching upon events before, during and after commission of the offense. *Dennis v. State*, 647 S.W.2d 275 (Tex.Cr. App.1983). We conclude that the court's charge on the law of parties was authorized by the evidence.

The evidence showed that Samantha Davidson acted together with appellant in many of the activities connected with the murder. She drove to the airport with the deceased to pick up the appellant. The evidence indicated that she may have checked the deceased into a motel at a time when the deceased may have already been dead. Samantha Davidson was also seen in the company of the appellant when they drove to a flower shop to purchase gardenias on or about the day of the murder and when they rented a van in Austin a few days later. Finally, she was with the appellant when they were arrested by the United States Customs Agents in Blaine, Washington on December 19, 1980. We believe this evidence sufficient to raise the issue that appellant may not have acted alone but instead may have acted together with Samantha Davidson.

In that portion of the charge which applied the law of parties to the facts, the charge read:

> ... if you believe from the evidence beyond a reasonable doubt that on or about the 6th day of November, 1980 ... Vernon Ray Gilmore, *either acting alone or with another as a party to the offense* ... did then and there intentionally and knowingly cause the death of ... Richard Grier Luster ... you will find the defendant guilty of the offense of murder ... [emphasis added.]

Since we have concluded that the evidence raised the issue of appellant's criminal responsibility with Samantha Davidson, it follows that the above stated charge properly applied the law of parties to the facts of the case. Appellant's eighth ground of error is overruled.

For the reason hereinabove expressed, the judgment of the trial court is reversed and the cause remanded for retrial.

REYNOLDS, Chief Justice, concurring.

I concur in the decision that, on the rationale expressed in the court's opinion, the judgment of conviction must be reversed because of the erroneous admission of the newspaper articles into evidence. However, I withhold my concurrence from the portion of the opinion which holds that the collective knowledge of the law enforcement officers constituted sufficient probable cause to effect the arrest. In my view, the record does not present the *Williams v. State*, 621 S.W.2d 609 (Tex.Cr.App.1981), situation where an officer, possessing information sufficient to constitute probable cause, requests an arrest effected by another officer. Rather, it presents the situation where an officer, having received satisfactory proof that a felony has been committed, was authorized to arrest appellant without a warrant upon his personal observation that appellant was about to escape. Tex.Code Crim.Pro.Ann. art. 14.04 (Vernon 1977); *King v. State*, 631 S.W.2d 486, 498 (Tex.Cr.App.1982).