**Valerie Susan TAYLOR, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–90–00906–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

April 29, 1993.

Rehearing Denied May 27, 1993.

Terri Tipton Holder, Angleton, for appellant.

Jim Mapel, Kelly McClendon, Angleton, for appellee.

Before MIRABAL, SAM BASS and O'CONNOR, JJ.

## OPINION

MIRABAL, Justice.

A jury found appellant, Valerie Susan Taylor, guilty of murdering her four-year-old daughter. The jury assessed punishment at confinement for life. We affirm.

Appellant pled "not guilty by reason of insanity." The State conceded appellant was mentally disturbed, but took the position appellant knew the difference between right and wrong at the time of the killing. Further, the State showed that appellant smoked marihuana the night of the offense, and presented evidence regarding the effect of marihuana on a paranoid schizophrenic.

In her fifth point of error, appellant asserts the verdict of the jury was so against the great weight and preponderance of the evidence as to be manifestly unjust. Appellant argues she proved the affirmative defense of insanity, and her conviction should be reversed.

The standard of review employed by courts of appeals when examining the

factual sufficiency of evidence supporting an affirmative defense is whether, after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 152 (Tex.Crim. App.1990). In claiming insanity as an affirmative defense, appellant had both the burden of production of evidence and the burden of persuasion on the issue. *Id.* at 150.

The jury charge, in relevant part, reads as follows:

The defendant, Valerie Susan Taylor, stands charged by indictment with the offense of murder, alleged to have been committed in Brazoria County, Texas on or about the 8th day of November, 1989. To this charge the defendant has pleaded "not guilty by reason of insanity."

Our law provides that a person commits the offense of murder if she intentionally or knowingly causes the death of any individual, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

. . . .

A person acts intentionally or with intent with respect to the nature of her conduct or to a result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly or with knowledge, with respect to the nature of her conduct or to circumstances surrounding her conduct when she is aware of the nature of her conduct or that the circumstances exist. A person acts knowingly or with knowledge, with respect to a result of her conduct when she is aware that her conduct is reasonably certain to cause the result.

Voluntary intoxication does not constitute a defense to the commission of a crime.

For the purpose of this section "intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

Now, if you find from the evidence beyond a reasonable doubt that on or about the 8th day of November, 1989 in Brazoria County, Texas, the defendant, VALERIE SUSAN TAYLOR, did then and there intentionally or knowingly cause the death of an individual, namely Meara Taylor by stabbing the said Meara Taylor with a knife, a deadly weapon, which in the manner and means of its use or intended use was capable of causing serious bodily injury or death; or if you find from the evidence beyond a reasonable doubt that on or about the 8th day of November, 1989, in Brazoria County, Texas, the defendant VALERIE SUSAN TAYLOR, did then and there with intent to cause serious bodily injury to an individual, namely Meara Taylor, intentionally and knowingly commit an act clearly dangerous to human life, to-wit: did stab the said Meara Taylor with a knife, a deadly weapon which in the manner and means of its use or intended use was capable of causing serious bodily injury or death, which caused the death of said Meara Taylor, then you will find the defendant guilty of murder as charged in the indictment.

But unless you do so believe from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of murder and say by your verdict, "not guilty."

It is an affirmative defense to prosecution that, at the time of the conduct charged, the defendant, as a result of severe mental disease or defect, did not know that her conduct was wrong.

The term "mental illness or defect" does not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct.

The burden of proof is on the defendant to prove an affirmative defense by a preponderance of the evidence. The term "preponderance of the evidence" means the greater weight of the credible evidence.

Now, therefore, if you find and believe from the evidence beyond a reasonable doubt that the defendant committed the offense of murder, but you further find

by a preponderance of the evidence that, at the time of the conduct charged, the defendant as a result of severe mental disease or defect, did not know that her conduct was wrong, you will acquit the defendant and say by your verdict "not guilty by reason of insanity."

Following is a summary of the relevant evidence:

■ Appellant began the fall semester at Alvin Community College in 1989. Her English professor was Dr. Dickie Fox. Appellant approached Dr. Fox in the early weeks of September and requested help obtaining employment. During the conversation, she told him that she wanted to be his mistress and wanted him to set her up in an apartment. Dr. Fox was shocked and refused her proposal. About the first week of October, appellant delivered a note to Dr. Fox that asked, "What do you have against me? Why don't you love me?" About four days after that, appellant withdrew from school. Around October 28, appellant came in to visit with Dr. Fox, accompanied by her daughter. At that meeting, she asked him why he didn't love her, and asked why he was saying bad things about her. She accused him of talking about her on the car radio and television. In Dr. Fox's opinion, at the time of that last meeting, appellant knew the difference between right and wrong, even though she apparently had mental problems.

Appellant's mother, Ruth Vaughn, knew about appellant's infatuation with Dr. Fox because appellant had accused her of working with Dr. Fox to keep appellant from getting a job. Appellant further told her mother that Dr. Fox sent messages to her through the ads on the car radio.

About 10 days before appellant killed her daughter, appellant called her mother, Mrs. Vaughn, and told her she was going to commit suicide. Mrs. Vaughn felt appellant needed some help and contacted the Brazoria County mental health deputy about the procedure for a mental commitment. Someone from the mental health department went out to see appellant, and reported to Mrs. Vaughn that when they got there, everything seemed perfectly normal. She did not follow through with having appellant committed.

A few days before the killing, appellant told her mother that she was going to hurt her in a way that would hurt her the most. Appellant's mother was very close to her granddaughter, Meara. She testified that appellant had a violent temper, and related stories to that effect. Appellant's mother testified she was "sure" appellant knew the difference between right and wrong on the date of the offense.

About 10 days before the killing, appellant wrote her ex-husband a letter asking for his help in getting Dr. Fox out of her mind. She wrote that Dr. Fox was reading her mind and trying to drive her crazy, and that she thought her ex-husband could help because he knew "all about God and stuff."

Raymond Kirkland testified that on November 8, 1989, the day of the killing, appellant spent the day with her four-year-old daughter, Meara, and 11-month-old son, Frankie, at Ray Kirkland's home. Kirkland is Frankie's father. Appellant and Kirkland had separated about three months prior to the offense and were attempting to reconcile. Shortly after Kirkland returned home from work, Kirkland, appellant, and the children went to appellant's home in Rosharon, about a 40-minute drive away. During the drive, Kirkland lit a marihuana cigarette and shared it with appellant.

When they got to the house at about 7:00 or 7:35 p.m., the children were put upstairs in their bedroom. Appellant and Kirkland went outside to feed the chickens and horses. They spent time talking, and appellant told Kirkland she was going away "to the other side of the moon," and she was the "chosen one." They returned to the house, and shortly heard something break and "Meara hollering that Frankie did it." Appellant found Meara had broken a music box that Kirkland had given appellant. Appellant then picked up Meara's Care Bear music box and broke it in front of her. Appellant and Kirkland then changed Frankie's diaper, and appellant took a shower. Kirkland started to prepare dinner, but found he did not have the condi-

ments he needed, and went to the store. Kirkland testified that upon his return to the house, appellant met him at the front drive. She told Kirkland he did not want to go upstairs because he would never be able to forget what he would see. Appellant explained she killed her daughter because she was afraid her daughter was going to harm her infant son.

Kirkland called 911. Appellant spoke with the 911 operator and in response to the question of why she did it, she said she didn't know, that something came over her and that she'd tell him about it later. The tape recording of appellant's telephone conversation with the police dispatcher was played to the jury.

Appellant told Kirkland if the authorities did not hurry up and get there, she was going to leave. Kirkland testified appellant knew killing her daughter was against the law. He stated appellant knew it was against the law because they had discussed how wrong child abuse is. Kirkland said appellant has a violent temper, and gave examples. Kirkland further testified he had visited appellant while she was in jail, and appellant told him she anticipated she might "get off on insanity."

The first officer on the scene testified that upon arrival at appellant's home, shortly after the incident, appellant immediately responded she "was only trying to keep her daughter from killing her baby." Appellant explained "that she had just got upset with the child and that she had started fighting her." The officer read appellant her rights, and appellant said she understood them. Appellant appeared calm and quiet at the scene. Appellant showed the officer where the murder weapon was located, in the kitchen sink. Appellant gave the officer her height, weight, and eye and hair color. Appellant also gave the officer her daughter's full name and birth date. The officer testified appellant appeared lucid and she cried while getting in the back of his police car. The officer testified that nothing about appellant indicated she did not know the difference between right and wrong.

Upon arrival at the police station, appellant was taken before a justice of the peace, Wayne Dubose, who read appellant her rights. Dubose testified appellant understood each of her rights when read to her. He stated appellant was crying. Appellant never mentioned anything about a mental illness, and nothing about appellant made Dubose feel she was mentally ill. Dubose stated appellant acted like everyone else.

After the magistrate's warnings were read to appellant, officer Dorman Davidson had a conversation with appellant. Appellant said she wanted to make a statement. Appellant caught some grammatical errors made by Davidson while typing her statement. Appellant made Davidson redo her statement pursuant to her direction. Appellant showed no emotion during the making of the statement, except when she was describing what she had done to her daughter. Appellant never indicated she did not understand what was going on, nor did she behave in a manner indicating she was mentally ill.

Appellant's written statement was admitted into evidence. It states, in relevant part: [1]

> I am 27 years of age; I was born in Brookfield, Penn. on 5–11–63 and at present I consider the following address my home: 4803 Lake Drive, Rosharon, Texas. I graduated from Alvin High School in 1981. I can read and write the English language. I would like to tell you at this time what happen tonight.
>
> I have been at a friends house on Fig Lane in Angleton all day today with my daughter, Meara Brooke Taylor, and my son Franklin Don Kirkland. I rode with a friend, Raymond Kirkland. I stayed there all day while he was at work. At around 6 or 7 P.M. Raymond took me and the kids home. While going home Raymond pulled out a marihuana cigarette and he lit it up. We then passed it back and forth. The kids were in the car with us. When we got home we turned on the TV after we moved the TV to the

1. Grammatical errors in this reproduction of       the statement appear in the original.

back room. We just wanted to be alone. While Raymond was plugging in the TV, I went into the bathroom and changed Frankie's diaper. After changing the diaper we both went into the kitchen and I put Frankie into his crib. Meara was in her bed by Frankie's crib. Me and Raymond went down stairs and fed the horses. I heard the telephone fall to the floor and I thought it was ringing. I then went back inside and found my baby boy music box on the floor broken. I found the music box in Meara's room by her bed and Raymond ask Meara what had happened. She said that she didn't do it. Meara just kept saying that she did not do it. I then got mad and threw Meara's care bear music doll. I broke it right in front of her. Meara then sat down on her bed and held her face with her hands. I said that's the last time that you will break anything of mine. I then went to the bathroom and took a shower. I got out of the shower and after I got dressed I went into the kitchen and Raymond was cooking a steak. I told Raymond that I did not have any mushrooms or onions to put on the steak. He said that he would go to the store. I walked Raymond down the stairs and he got into the car and left. I then went back and fed horses. I then went back upstairs because I heard some more noise coming from the house. When I got upstairs Meara was half way in Frankie's crib. I told Meara to get up and get in her bed. She got in her bed. I was real mad at Meara and I saw her almost in Frankie's crib. When I come in the house I went to the kitchen and got my green army knife that I had on the kitchen shelf. The knife was already open. Meara was already in bed. I went to the bed and sat down on it. This was when I pulled her shirt up over her head. Meara then said, I don't want to die. Meara saw the knife in my hand. I said yea you do. Meara said I don't wana die. I said nothing. I then pulled her shirt over her head. She was trashing around too much. I did this to hold her still. I then pulled her arms behind her back so she would stop moving around. She was

not crying. She just kept saying, I don't want to die. I then put the knife to her chest and tried to cut her. It didn't work so I put the knife to her throat and held it there for a minute. I thought she was going to die slow so I took the knife and stabbed her a bunch of times. I do not know how many times. Meara started crying.

After the first few stabs, I then cut her throat because she was still breathing. Her head fell almost off the bed. Blood squirted in my face and everywhere. I pushed her head back so she could bleed better. I then took the knife to the kitchen and put the knife in the sink and washed the blood off of my hands. Before I did that I covered Meara's body up except for her feet. After I wash my hands I then went and picked Frankie up. I put Frankie on my hip and we then walking around the block. I believe this all happen around 8:00 P.M. I then stayed outside until Raymond come back with the groceries. When he drove in the drive way I got in on the passenger side and told Raymond what I had done. Raymond ordered me upstairs and he followed me. I told Raymond that Meara was in the bed and that I covered her up. Raymond then went to the bed and uncovered her. Raymond then ordered me to sit down and he went to the telephone and called for help. I sat on the kitchen floor. The police called back and Raymond gave me the phone and I told the police what I had done.

I killed Meara for several reasons. One is I could no longer afford to support her. Two, I could not take the pain of her real father taking her away. I could not stand it because Meara told me that he treated her real bad. She was scared of him. She was a different child ever time I got her back. Her real father's name is Joseph Allen Taylor. I think at this time that he is in the Navy in Scotland.

. . . .

Witness my hand this the 9th day of November, A.D.1989, at 1:50 o'clock, a.m., at Angleton.

/s/Valerie Susan Taylor

Meara's body had 20–30 stab wounds to the chest and abdomen area, and her neck was cut in such a way that the carotid artery was severed.

Appellant testified at the guilt-innocence phase of the trial. She testified that several weeks before Meara's death, strange occurrences began around her house that had a special significance to her. The neighbors named their dog "Taylor" and the dog killed appellant's new puppy. The pepper plants grew all twisty and the peppers didn't get very big, which gave Appellant a dark, scary feeling. The chickens quit laying eggs, and the hibiscus bloomed when all the other flowers died.

Appellant testified that her professor, Dr. Fox, could read her mind, and other people's minds too. She indicated her professor was everywhere; that he put songs on the radio. She feels that her professor is the reason for her daughter's death. What she does not understand is how he comes about the forces that he has, the forces that he transfers into her brain somehow.

On the night of the offense, Appellant told her boyfriend that she was going somewhere. She didn't want to but she had to, she had no choice. She felt she had to do something. She couldn't let God down and a whole lot of other people. She told her boyfriend that she was going to the moon. That she was the chosen one.

Appellant testified she was angry with her daughter on the day she killed her, for breaking appellant's music box and trying to get into her infant son's crib. She recalled feeling a compelling force that made her go upstairs into her children's room; she was thinking she had to kill her daughter. She recalled the only thing in her mind was to kill her daughter. As she looked at Meara, she saw she had dark circles under her eyes. Appellant thought Meara was not Meara. She recalled punching her daughter to see if it made her "feel bad," and therefore to determine whether she could go through with stabbing her. She recalled looking at Meara and thinking the devil had tricked her into thinking

Meara was her daughter, when she was not really her daughter. She recalled beginning to stab her daughter, and when Meara kept saying, "I don't want to die," appellant thought she was lying to make appellant even madder. Appellant recalled at one point she asked herself whether it was right, and she then looked at her infant son thinking that if he was to scream or cry she'd know it would be the wrong thing to do. Her son was not crying, thereby confirming the correctness of her actions. Appellant said it was not up to her to question the correctness of her actions, just for her to obey. Appellant described the feeling as a "force." Appellant recalls feeling "God" had "used" her.

Appellant admitted she did not mention anything about any forces, or voices, compelling her to kill her daughter, either to Kirkland or the police. Further, she did not tell anyone about her belief, that her actions were correct based on the fact her infant son did not cry, until she met with Dr. Paul Malone, appellant's expert witness. Appellant admitted she had become angry after smoking marihuana in the past, and such use had caused her to react violently.

Two expert witnesses testified regarding appellant's sanity on the night of the offense. Dr. Paul Malone, appellant's expert, examined appellant on January 11, 1990, two months and three days after appellant killed her child. Dr. Fred Fason, the State's expert, examined appellant on April 11, 1990, five months and three days after she killed her child.

Dr. Malone is a clinical psychologist. Dr. Malone examined appellant for approximately three to four hours in order to determine her competency and sanity. To this end, Dr. Malone administered six standard tests.

Appellant explained what she could remember of the night of her daughter's death to the Dr. Malone. He testified that she said she had to do something for the Lord. She thought it had something to do with the dark side of the moon; something kept making her want to go upstairs, kept telling her she better go before she chick-

ened out. Appellant explained she punched her daughter in the eye to see if she could do it, and she didn't feel bad, so she knew she could do what she had to do. Appellant further explained that the first two stabs, she was mad. She was mad at her ex-husband. After that, she just kept hearing a song saying "go for the throat." It was then that she looked at her son and he didn't scream, so she knew what she had done was right. She told the Dr. Malone the whole thing was a trick of the devil.

Dr. Malone concluded appellant is a paranoid schizophrenic who was psychotic three to four weeks before, during, and the day after the killing. He stated that the most common thing that triggers a psychotic episode is that a paranoid schizophrenic's sense of support is threatened in some way.

Dr. Malone further testified he did not think appellant knew right from wrong during the three to four week period prior to the killing, as well as when she killed her child, and therefore she was insane at the time of the offense. Dr. Malone based his conclusion largely on appellant's statement to him that she knew she had "done the right thing" because her infant son did not scream at the sight of his sister being killed.

Dr. Malone also testified that at the time of the offense, appellant knew she had a knife in her hand and that it could cause harm to someone. However, Dr. Malone could not say whether appellant knew she was stabbing a human being during the killing, even though he believed appellant may have been able to identify her daughter "at least part of the time." He concluded that appellant had a faulty sense of right and wrong, and that even if she knew she was stabbing a human being, and knew that was against the law, she still thought what she was doing was right.

Appellant told Dr. Malone that after she smoked the marihuana in the car, she began laughing and crying at the same time and could not stop. Appellant said she had told her daughter during the trip to her house, that she was going to kill her. Dr. Malone testified that although he did not

believe appellant's marihuana use on the night of the offense had anything to do with her actions, marihuana use by schizophrenics can trigger a psychotic episode. He acknowledged appellant could be "faking" the severity of her mental illness in order to "get off on insanity," but he did not believe appellant was "faking."

Dr. Fason, the State's expert, is a medical doctor whose field of medicine is psychiatry. He has examined between 1500 and 2000 criminal defendants for the purpose of determining their competency and sanity. Dr. Fason examined appellant for approximately 45 minutes, during which time he visited with appellant and appellant took a psychiatric test. Appellant indicated she thought someone had control over her mind and someone was making her do things by hypnotism. She said the events of the offense were planned by God, and she did not want to "let God down."

Dr. Fason based the conclusions he reached on his interview with appellant, his interview with appellant's mother, a letter appellant had written to her ex-husband, witness statements, the tape recording of appellant speaking with the 911 operator on the night of the offense, and appellant's written confession.

Dr. Fason diagnosed appellant as being a "paranoid personality disorder who decompensates at times into a psychosis of paranoid schizophrenia." He stated that although appellant was psychotic at the time she killed her child, she was nonetheless sane. He said a paranoid schizophrenic in a psychotic state would have false beliefs or delusions, and would frequently act on those beliefs or delusions because he believed it was something he must do. Dr. Fason testified that even in a psychotic state, a paranoid schizophrenic can still know the difference between right and wrong.

Dr. Fason explained that use of marihuana by a paranoid schizophrenic, such as appellant, can trigger a psychotic event, but he believed appellant was in a psychotic state even before she smoked the marihuana on the night of the offense. He said appellant's use of marihuana on the eve-

ning in question was a contributory cause of her actions because it loosened appellant's control over her temper. Dr. Fason explained appellant killed her child because she lost control of her temper. Appellant told Dr. Fason she had become angry with her daughter prior to the killing. Appellant told him she became even madder at her daughter during the act because her daughter kept saying "I don't want to die," and appellant thought her daughter was lying to her.

Dr. Fason testified he could find no evidence that appellant was legally insane at the time of the offense. He said that although appellant has a severe mental defect, she nonetheless knew her actions were wrong. Dr. Fason based his conclusion on appellant's statement to him that she thought her actions were wrong at the time, but that she just did not think about it. He also stated appellant's "post-action rationalizations" indicate appellant underwent an internal struggle, due to the fact she knew her actions were wrong. Appellant rationalized her conduct during the commission of the crime by telling her daughter she wanted to die. Appellant rationalized her conduct immediately following the killing by telling Kirkland and the investigating police officer she killed her child because she thought her daughter was trying to harm her other child. Appellant rationalized her conduct in her confession made shortly after the killing by explaining she killed her child because she could no longer afford to support her daughter, and she did not want her daughter's real father to take the child away.

Also testifying at trial was a second college professor who had contact with appellant during the time appellant's expert contended appellant was psychotic and unable to know the difference between right and wrong. He stated that, at the time he had contact with appellant, she did not do anything to make him think she did not know the difference between right and wrong.

Also testifying were two nurse-jailers, one of whom had contact with appellant on the night of the offense, and the other of whom continues to have contact with appellant while she is in jail. Each testified there was nothing about their contact with appellant that would make them believe appellant did not know the difference between right and wrong.

A retired couple who lived next door to appellant also testified. Dale Bliss said he and his wife had known appellant for four or five years. He remembered when appellant and her husband were building their place. He said appellant always kept her daughter clean. She spent a lot of time with her, and he was under the impression appellant loved her daughter, even though he never saw her hug or kiss her. He described appellant's personality traits as "below normal" because she had a bad temper and would cuss and scream and carry on. He saw her angry many times. He witnessed fist fights between appellant and Raymond Kirkland, with appellant being the instigator. The last time he saw appellant was about three days before the killing. Appellant was with her horses and was acting normally.

Dale Bliss' wife, Sylvia, was asked by the defense counsel to tell the jury a little bit about appellant and her personality. Ms. Bliss testified that, up to about six months before the killing, appellant was a good mother to Meara and Meara was a happy child. She noticed a definite change in appellant and Meara about six months before Meara's death. Appellant looked distraught all the time, and Meara "just didn't look happy anymore." It was during that last six months that Ms. Bliss noticed appellant smoking marihuana; she had never seen appellant smoke marihuana before that. A few days before the killing, Ms. Bliss asked appellant where her son Frankie was. Appellant responded that "she couldn't afford him and she gave him to the daddy."

At all relevant times, section 8.01 of the Texas Penal Code provided in pertinent part:

(a) It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong.

Tex.Penal Code Ann. § 8.01(a) (Vernon 1992).

■ The purpose of the insanity defense issue is to determine whether the accused should be held responsible for the crime, or whether his mental condition will excuse him from such responsibility. *Graham v. State*, 566 S.W.2d 941, 948 (Tex. Crim.App.1978).[2] Although the defense is expressed in terms of a "mental disease or defect," the issue is not strictly a medical one. *Id.* It is an issue that invokes ethical and legal considerations as well. *Id.* From a medical standpoint, one may be insane by reason of a mental disease or defect, yet, from a legal aspect, he is not exonerated or excused for a crime committed while in that condition, unless or until his mental condition has reached the point where he is unable to distinguish right from wrong. *Id.* A mere mental disease or defect, though it may constitute a form of insanity known to and recognized by medical science, does not excuse one for committing a crime. *Id.*

■ Because the issue is not strictly medical, expert witnesses, although capable of giving testimony that may aid the jury in its determination of the ultimate issue, are not capable of dictating determination of that issue. *Graham*, 566 S.W.2d at 949. "Only the jury can join the nonmedical components that must also be considered in deciding the ultimate issue." *Id.* The ultimate issue of criminal responsibility is beyond the province of expert witnesses. *Id.* Were it not, the issue would be tried in hospitals rather than courts. *Id.* Were it not, a determination of the issue of insanity would be solely in the hands of psychiatrists, and the important function of the jury to make such a determination would be vitiated. *Id.*

■ The issue of insanity at the time of the offense excusing criminal responsibility

lies exclusively within the province of the jury, not only as to the credibility of the witnesses and weight of the evidence, but as to the limits of the defense itself. *Graham*, 566 S.W.2d at 952; *Ward*, 787 S.W.2d at 119; *Patel*, 720 S.W.2d at 897. In this regard, it is well established that a jury may accept or reject, in whole or in part, the opinion testimony of physicians, and can accept lay testimony over that of experts. *Graham*, 566 S.W.2d at 952; *Ward*, 787 S.W.2d at 119.

Examination of *Ward* and *Patel* is instructive in this regard. In *Ward*, a jury rejected Ward's insanity defense, convicted him of murder, and assessed punishment at life in prison. *Ward*, 787 S.W.2d at 117. On appeal, Ward argued that the great weight and preponderance of the evidence proved his insanity. *Id.* The court examined Ward's challenge in light of the above-cited standard from *Meraz*.

The evidence showed that Ward had become angered and upset over his ex-wife's refusal to reconcile. *Ward*, 787 S.W.2d at 117–118. On the date of the offense, Ward called his ex-wife and threatened to kill their child because she would not reconcile. *Id.* Subsequently, Ward shot the child in the forehead, killing the child, and then turned the gun on himself, sustaining only a nonfatal wound to the head. *Id.* At trial, Ward argued he was insane during the period when the offense occurred. *Id.*

In support of his insanity defense, Ward called two expert witnesses. *Ward*, 787 S.W.2d at 117–18. The first was a psychotherapist who had begun counseling Ward for depression and anger control several weeks after he and his wife separated. *Id.* The psychotherapist testified Ward had a difficult time accepting his separation and that he needed professional help controlling his temper. *Id.* He further testified Ward had a great deal of hostility. *Id.*

**2.** *Graham* was decided before the legislature, in 1983, eliminated the second prong of section 8.01 of the Texas Penal Code, which allowed an accused to predicate insanity on her inability to conform her conduct to the dictates of the law. Even so, the statements of law contained in *Graham* relating to the nature of the insanity defense and the role of jury, lay witnesses and

expert testimony in determining the ultimate issue of an accused's insanity are unaffected by the statutory change, and are cited extensively in *Ward v. State*, 787 S.W.2d 116 (Tex.App.— Corpus Christi 1990, pet. ref'd), and *Patel v. State*, 720 S.W.2d 891 (Tex.App.—Texarkana 1986) aff'd, 787 S.W.2d 410 (Tex.Crim.App. 1990).

The second expert witness testifying on Ward's behalf was a psychiatry specialist. *Ward*, 787 S.W.2d at 117–18. After a week and a half of examining Ward, the doctor diagnosed Ward as being a "pseudopsychopathic schizophrenic." *Id.* The doctor concluded Ward "did not know what he was doing on the date of the offense due to his severe mental defect or disease." *Id.*

The State called several rebuttal witnesses who testified regarding Ward's lack of remorse for the murder and their experiences with Ward's temper outbursts. *Ward*, 787 S.W.2d at 117–18. Additionally, it called a psychiatrist who had examined Ward for an hour. *Id.* at 119. The state's doctor concluded there was no evidence that Ward was insane at the time of the offense, and that Ward was one that "knew his murderous conduct was wrong." *Id.*

The appellate court, relying on the above-cited language from *Meraz* and *Graham*, concluded that "a rational trier of fact could have resolved the conflicting testimony regarding legal insanity against [Ward]," and that "the jury's decision to disbelieve the insanity testimony was not so against the great weight and preponderance of the evidence that it created a manifest injustice." *Ward*, 787 S.W.2d at 117–18.

In *Patel*, Patel was convicted of murder. 720 S.W.2d at 892–93. At trial, Patel argued he was insane at the time of the killing. *Id.* On appeal, Patel challenged the jury's implied finding of sanity at the time of the offense. *Id.* at 895.

The evidence showed that on October 25, 1983, police discovered the dead bodies of Patel's wife and three children in the family's apartment. *Patel*, 720 S.W.2d at 893. Each had died of a gunshot wound to the abdomen. *Id.* Patel apparently fled the scene in the family car and was later discovered by a Department of Public Safety trooper about 60 miles from the scene of the crime, whereupon Patel shot himself in the abdomen in an apparent suicide attempt. *Id.* at 893, 897. After receiving treatment for his wound at a local hospital, Patel was taken to Rusk State Hospital to determine his competency to stand trial. *Id.* at 893. Patel was diagnosed as being incompetent to stand trial and a jury in Upshur County agreed. *Id.* Subsequently, Patel was determined competent to stand trial and did in fact stand trial for murder. *Id.*

At trial, Patel called three expert witnesses to testify as to his insanity at the time of the offense. *Patel*, 720 S.W.2d at 895–97. The first was a psychiatrist named Srinivasan who examined Patel during his stay at Rusk State Hospital. *Id.* at 895. The doctor theorized Patel might have a brain tumor and, failing that, was a schizophrenic. *Id.* The doctor stated that Patel suffered from paranoid delusions, "flat" emotions, and that he was probably psychotic. *Id.* at 896. The doctor concluded Patel did not know the act of killing his family was wrong. *Id.* Further, the doctor testified that the average layman would not be able to see the symptoms of Patel's alleged mental disease or defect. *Id.*

On cross-examination, however, Dr. Srinivansan admitted he had no idea why Patel would drive 60 miles from the scene of the crime before he was apprehended. *Patel*, 720 S.W.2d at 897. Further, the doctor revealed Patel had said that his wife had asked him to get an ambulance, and that he realized at that point he may have done something wrong. *Id.* Also on cross-examination, the doctor admitted it would have strengthened his diagnosis if lay persons had testified concerning unusual behavior over the past two years. *Id.* at 898.

The second doctor to testify was Dr. Littlejohn who examined Patel while he was being treated for his self-inflicted gun shot wound. *Patel*, 720 S.W.2d at 896. He too testified Patel was suffering from a paranoid delusional system, which he speculated had existed for several months. *Id.* Dr. Littlejohn testified Patel was being driven by this delusional system and was following the dictates of that system, believing it was right, and that Patel's ability to make decisions of right and wrong was markedly impaired. *Id.*

The third doctor to testify was Dr. Hall who examined Patel for an hour and a half

while Patel was in jail. *Patel,* 720 S.W.2d at 896. He testified he would not disagree with Dr. Srinivansan's conclusion that Patel suffered from a mental disease that prevented him from knowing right from wrong at the time of the offense. *Id.*

The State presented 12 lay witnesses on the issue of Patel's insanity, which included people who had done business with Patel, police officers who saw Patel shortly after he had been released from the hospital, and two long-time acquaintances of Patel with whom he had visited a few days before the shooting. *Patel,* 720 S.W.2d at 896. "In summary, these witnesses testified Patel was a good businessman, a quiet man, a man they had never seen angry, and a man who appeared normal in every respect." *Id.*

In concluding that a rational trier of fact could have determined that Patel failed to prove the defense of insanity by a preponderance of the evidence, and that the evidence sufficiently supported the jury's implied finding of sanity, the court quoted the above-cited portions of *Graham* regarding the nature of the insanity defense and the role of the jury, lay witnesses and expert testimony in determining the ultimate issue of Patel's criminal responsibility for his acts.

In the present case, the jury heard two expert witnesses who agreed appellant was mentally disturbed, but who disagreed about whether appellant knew right from wrong at the time of the offense. The jury heard the tape recording of appellant's conversation with the police dispatcher immediately after the killing, and read her written confession that she signed soon after the offense. The jury heard from various witnesses who dealt with appellant immediately before and immediately after the killing; all of these witnesses testified that they observed nothing to make them think appellant did not know stabbing her daughter was wrong. While she was in prison awaiting trial, appellant said she would "get off on insanity." Knowing this, the jury had before it appellant's in-court testimony about the forces that compelled her to act. The jury knew that appellant did

not tell anyone she came in contact with immediately following the offense that she was "compelled by forces" to kill, or that she knew she had done the right thing because her infant son did not cry. Appellant gave specific reasons for killing her daughter in her written confession, making no reference to God, or the devil, or compelling forces. Many witnesses testified about appellant's violent temper, and the jury heard from a number of witnesses about appellant's recent use of marihuana and the effect it had on her.

Appellant had the burden to prove that when she stabbed her daughter her mental disease prevented her from knowing her conduct was wrong. The jury was to make its finding on this issue in accordance with the greater weight of credible evidence before it. It is our conclusion that the jury's finding against appellant on the insanity defense is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

We overrule point of error five.

In point of error one, appellant asserts the trial court erred by charging the jury on voluntary intoxication at the guilt-innocence stage, because intoxication was not raised by the evidence. In point of error two, appellant asserts the voluntary intoxication instruction unfairly shifted the burden of proof to appellant.

▇▇▇▇ Texas law has long held that the trial court must charge the jury fully and affirmatively on the law applicable to every issue raised by the evidence, whether such evidence be produced by the State or the defense, and whether it is strong or feeble, unimpeached or contradicted. *Kibbe v. State,* 133 Tex.Crim. 494, 112 S.W.2d 733, 734 (1938); *see Booth v. State,* 679 S.W.2d 498, 500 (Tex.Crim.App.1984). Further, the trial court must give instructions that are applicable to every legitimate deduction from the evidence. *Gilmore v. State,* 666 S.W.2d 136, 156 (Tex.App.—Amarillo 1983, pet. ref'd) (citing *Williams v. State,* 605 S.W.2d 596 (Tex.Crim.App. [Panel Op.] 1980)). Therefore, if the evidence raises an issue and a charge on such issue is properly requested, then a charge on that issue

must be given. *Gilmore,* 666 S.W.2d at 156 (citing *Day v. State,* 532 S.W.2d 302 (Tex.Crim.App.1976)). The proper inquiry, therefore, is to determine whether the evidence adduced at trial raised the issue of appellant's voluntary intoxication, so as to warrant an instruction. *See Gilmore,* 666 S.W.2d at 156.

Appellant complains about the inclusion of the following instructions in the jury charge:

> Voluntary intoxication does not constitute a defense to the commission of crime.
>
> For the purpose of this section "intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

This language tracks section 8.04, subsections (a) and (d) of the Texas Penal Code. TEX.PENAL CODE ANN. § 8.04 (Vernon 1974). Subsections (b) and (c) of section 8.04 delineate when the court shall charge the jury on temporary insanity due to intoxication:

> (b) Evidence of temporary insanity caused by intoxication may be introduced by the actor *in mitigation of the penalty* attached to the offense for which he is being tried.
>
> (c) When temporary insanity is relied upon as a defense and the evidence tends to show that such insanity was caused by intoxication, the court shall charge the jury in accordance with the provisions of this section.

TEX.PENAL CODE ANN. § 8.04(c) (Vernon 1974) (emphasis added).

Appellant made the following objection to the inclusion of the charge on voluntary intoxication:

> Defense Counsel: Your Honor, at this time object to the instruction as to temporary insanity, voluntary intoxication in that that does not come under the guidelines of Section 8.04 of the Penal Code. And we are not raising any defensive issues that would *go* to that particular instruction.
>
> The Court: That objection is overruled. Do you have further objection?
>
> Defense Counsel: No, sir.

> The Court: Any special requested instructions?
>
> Defense Counsel: No, sir.

Appellant argues the charge on voluntary intoxication was improper because she did not rely on "temporary insanity due to intoxication" as a defense, and the charge unfairly placed the burden on appellant to prove the marihuana *did not* cause her insanity.

The State claims the charge was proper because appellant "relied upon the defense of insanity in this case and there was evidence which tended to show that '... such insanity was caused by intoxication ...'" In other words, the State urges that, if appellant did not know right from wrong at the time of the offense, such state of mind was caused by the marihuana use.

The evidence at trial indicated that appellant had used marihuana in the recent past and that it caused her to act differently. Further, the evidence showed that appellant had smoked marihuana within a few hours of killing her child. Kirkland testified that shortly before killing her child, appellant was "babbling on" about going to the "other side of the moon" and being "the chosen one," and that he attributed her irrational behavior to her marihuana use on the evening of the offense. In describing the events immediately leading up to the death of her child, appellant related to the State's psychiatric expert the following:

> I smoked a joint on the way home. Started feeling funny after that. Before I even got home, there's this vacant lot that scared me. Before we drove by that place, I told my daughter that I was going to kill her. It was like a sudden flash of anger towards her. There was no reason.

The State's psychiatric expert further testified that appellant's act of killing her daughter was the result of appellant losing control of her temper, and that her use of marihuana on the night of the offense "markedly" affected her control over her temper. He concluded that appellant's use of marihuana loosened her control on her

temper, which ultimately resulted in appellant killing her daughter.

In similar statements made to her own psychological expert describing the evening of the offense, appellant related that, "I smoked a joint and started laughing and crying at the same time and couldn't stop." When asked whether she felt that the marihuana had anything to do with her killing her child, appellant responded as follows:

No, I've smoked marihuana a lot during my life. And I've gotten made after smoking. And the worse I'd do is maybe slap Raymond or something like that. But killing, that is a lot different than punching somebody.

A charge on voluntary intoxication generally belongs in the court's charge at the punishment stage, not at the guilt-innocence stage. *Rodriguez v. State*, 513 S.W.2d 594, 595 (Tex.Crim.App.1974). This is because TEX.PENAL CODE ANN. § 8.04(b) (Vernon 1989) provides that evidence of temporary insanity caused by intoxication may be introduced in mitigation of the penalty for an offense. However, in the following cases, the jury instructions, that voluntary intoxication is no defense to the crime, were held to be proper at the guilt-innocence phase. *Jaynes v. State*, 673 S.W.2d 198, 202 (Tex.Crim.App.1984); *Williams v. State*, 567 S.W.2d 507, 510 (Tex.Crim.App.1978, pet. ref'd) (citing *Goodgame v. State*, 129 Tex.Crim. 250, 86 S.W.2d 753, 754 (1935)).

In *Jaynes*, the appellant was convicted of failing to stop and render aid. *Jaynes*, 673 S.W.2d at 199. The trial court's charge instructed the jury that if appellant did not know she had struck the complainant with her automobile, that would constitute an affirmative defense. *Id.* at 201. The trial court went on to instruct the jury that neither voluntary intoxication nor temporary insanity of mind caused by intoxication could constitute any defense to the crime. *Id.* Appellant objected to the latter portion of the instructions, arguing that such instruction constituted a comment on the weight of the evidence and unduly limited her defense because appellant was in no way asserting that her lack of knowledge was due to voluntary intoxication or temporary insanity caused by intoxication. *Id.* at 201–202.

The evidence adduced at trial in *Jaynes* showed the appellant was intoxicated on the date in question. Several witnesses testified the appellant appeared intoxicated. *Id.* at 200. Further, during the State's case in chief, the doctor who treated the appellant in the emergency room diagnosed the appellant as suffering from a drug overdose. *Id.* at 202. In finding that the trial court's instruction was proper, the court stated the following:

Article 36.14 of TEX.CODE CRIM.PROC.ANN. requires the trial judge to deliver to the jury a charge which distinctly sets forth the law applicable to the case. [Section 8.04] states that voluntary intoxication is not a defense to the commission of crime. Thus, when evidence came in *which might have led* the jury to believe that appellant was intoxicated at the time of the offense and this *might have contributed* to her defense of lack of knowledge of the offense, it was proper for the court to instruct the jury on the appropriate law. In view of the evidence before the jury, this was not error. [cite omitted] The jury was free to find that appellant had no knowledge of the accident as long as they did not attribute lack of knowledge to intoxication.

*Jaynes*, 673 S.W.2d at 202.

In the present case, there was also evidence "which might have led" the jury to believe that appellant was intoxicated at the time of the offense, and that such intoxication "might have contributed" to appellant's claimed insanity. Therefore, the trial court did not err by instructing the jury on intoxication. Further, as in *Jaynes*, the jury was free to find appellant insane "as long as they did not attribute" her insanity to intoxication.

In *Williams*, the appellant was convicted of attempted murder. *Williams*, 567 S.W.2d at 507. The trial court charged the jury on intoxication during the guilt-innocence stage of the trial, and the appellant contended such instruction was improper. *Id.* at 510. The evidence of intoxication in

*Williams* was weak. The only evidence tending to show any intoxication was the appellant's statements that he had been drinking at the time of the offense and that he had "too much to drink." *Id.* at 508. All four of the witnesses who had been with the appellant before and at the moment he committed the offense testified there had been no drinking of alcoholic beverages before the shooting. *Id.* Further, an investigating police officer testified he saw the appellant shortly after the shooting and "[appellant] was not intoxicated at that time." *Id.* The officer also testified that when he was investigating the scene of the crime, he had not seen any alcoholic beverages and none of the witnesses he spoke with appeared intoxicated. *Id.* Nevertheless, the court found the instruction proper. *Id.* at 510.

In light of these cases, we conclude the trial court's instruction was proper. Accordingly, we overrule points of error one and two.

■ In points of error three and four, appellant asserts the trial court erred by failing to comply with article 36.14 of the Texas Code of Criminal Procedure during the punishment phase of the trial. In point of error three, she argues the trial court commented on the weight of the evidence by correcting the verdict form as he read it to the jury and by correcting the form in his own handwriting. In point of error four, she argues the trial court did not give counsel reasonable time to examine the charge and present objections.

Article 36.14 provides in pertinent part:
[T]he judge shall, before the argument begins, deliver to the jury ... a written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury. Before said charge is read to the jury, the defendant or his counsel shall have a reasonable time to examine the same and he shall present his objec-

tions thereto in writing, distinctly specifying each ground of objection.

TEX.CODE CRIM.P.ANN. art. 36.14 (Vernon Supp.1993).

The complained of action is reflected in the record:

The Court: Behind the signature page is [sic] two possible forms of verdict. Omitting the reading of the formal heading. Verdict: We the jury having found the defendant Valerie Susan Taylor guilty of the offense of murder assess her punishment at confinement in the penitentiary for a term of "blank"—and counsel, it seems to me it could be the word "years" should be stricken. Any objections?

The State: No, your Honor.

Defense Counsel: No, sir, your Honor.

The Court: The Court strikes the word "year". So, it would read, "We the jury having found the defendant Valerie Susan Taylor guilty of the offense of murder, assess her punishment at confinement in the penitentiary for a term of "blank", being not more than 99 years—approach the bench, counsel.

(Brief discussion off the record)

The Court: Any objection, counsel, to the way the Court's changed the first verdict form?

The State: Nothing from the State.

Defense Counsel: Nothing from the defense.

The Court: Members of the jury, I apologize, first of all, to you. Secondly, I'm going to read the first verdict form in its entirety, as it now would be for your consideration.

Verdict: "We the jury having found the defendant Valerie Susan Taylor guilty of the offense of murder assess her punishment at confinement in the penitentiary for a term of "blank", being not more than 99 years, nor less than five years or life.

We further assess a fine of "blank", being not more than $10,000, and a place for the presiding juror to sign.

Appellant argues that by the trial court's statements and the deletion of the word "years" from the verdict form, the judge informed the jury of his opinion that only

one verdict was appropriate, the one of "life." In addition, appellant argues that the *handwritten* corrections by the trial court emphasized a particular punishment. Further, appellant argues that in making the correction before the jury, the trial court read the verdict form providing for a life sentence three times, as compared with once for the probated sentence verdict form. The jury, she argues, returned a sentence of life, "exactly" the sentence emphasized by the trial court.

We first note appellant's trial counsel did not object to the charge or to the unreasonableness of the time for review as required by article 36.14. Nor did counsel, by a special requested instruction, call the trial court's attention to error in the charge as required by article 36.15. *Ussery v. State*, 651 S.W.2d 767, 773 (Tex.Crim.App.1983); Tex.Code Crim.P.Ann. arts. 36.14, 36.15 (Vernon Supp.1993). Where there is no objection to the court's charge to the jury, nothing is preserved for review. *Thiel v. State*, 676 S.W.2d 593, 594 (Tex.Crim.App. 1984) (op. on reh'g). It is, however, appropriate to view the record as a whole in order to determine whether fundamental error is presented. *Ussery*, 651 S.W.2d at 773. Article 36.19 of the Texas Code of Criminal Procedure provides:

> Whenever it appears by the record in any criminal action upon appeal that any requirement of Articles 36.14, 36.15, 36.16, 36.17 and 36.18 has been disregarded, the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial. All objections to the charge and to the refusal of special charges shall be made at the time of the trial.

Tex.Code Crim.P.Ann. art. art. 36.19 (Vernon 1981).

We find the charge, as reformed by the trial court, properly reflected the applicable range of punishment. The original form was incorrect, and needed to be changed. Our review of the record convinces us the trial court's correction was neither calculated to injure the rights of appellant, nor did it deny her a fair and impartial trial. *See Gant v. State*, 606 S.W.2d 867, 872 (Tex. Crim.App. [Panel Op.] 1980); *Lewis v. State*, 763 S.W.2d 458, 460–61 (Tex.App.— Houston [1st Dist.] 1988, no pet.).

We overrule points of error three and four.

We affirm the judgment.

Justice O'CONNOR dissenting.

O'CONNOR, Justice, dissenting.

I dissent. The instruction on voluntary intoxication was not justified by the evidence, is not permitted by the law, and prejudiced the appellant's defense of insanity by impermissibly adding to the appellant's burden of proof.

The question we address is: When and in what circumstances may evidence of use of a minimal amount of intoxicant (not **intoxication** itself) by a person who is insane, be sufficient to instruct the jury on temporary insanity?

At the State's request and over the appellant's objections, the trial court instructed the jury that voluntary intoxication was not a defense and defined intoxication as a disturbance of mental and physical capacity resulting from the introduction of any substance into the body. The jury had three options in response to the jury charge: not guilty, not guilty by reason of insanity, and guilty. Because the appellant did not contest the evidence that she killed her daughter, the jury actually had only two options: not guilty by reason of insanity and guilty. The instruction on voluntary intoxication and the definition of intoxication skewed the burden of proof on the issue of insanity, so that the appellant was required to prove she did not cause her own insanity.

The appellant is a paranoid schizophrenic.[1] To illustrate her confused condition

---

**1.** Whether the appellant's condition is a "severe mental disease or defect" such that she "did not know that [her] conduct was wrong" when she killed her child, and thus is relieved of criminal liability for the death of her child, is the issue

around the time she killed her child, I summarize some of the evidence of her condition: Just before killing her child, the appellant said she was going to the other side of the moon, she was "the chosen one;" and she heard a song that said "go for the throat"; while she was stabbing her child, the appellant looked to her infant son for confirmation that what she was doing was required by "the force," and when she saw that he did not cry, she knew she was doing the right thing; the appellant said she was compelled to kill her daughter because her eyes were black; just before arriving home that night, she saw a vacant lot, which scared her, and she told her daughter she was going to kill her; a few weeks before the killing, the appellant noticed strange and significant things began to happen around her house—the neighbor's dog killed her puppy, the pepper plants grew "twisty," the chickens quit laying eggs, and the hibiscus bloomed—which gave her a scary feeling; a few months before the killing, the appellant said one of her professors talked about her on the radio and television, sent her messages through advertisements on the radio, and could read her mind; the appellant told her former husband that the professor was trying to drive her crazy; the appellant's mother knew something was wrong and had investigated the possibility of having her daughter committed; after the killing, the appellant said "God" had used her, she had not wanted to let God down, and the whole thing was a trick of the devil.

### No evidence of intoxication

The main issue in this appeal is the propriety of instructing the jury that voluntary intoxication is not a defense to the commission of a crime when the State acknowledges **the appellant was not intoxicated.** The State admits the appellant is a paranoid schizophrenic who was in a psychotic episode at the time she killed her

child. The State also admits the appellant was not intoxicated at the time she killed her child. The State's position on the instruction is that the appellant aggravated her condition by taking a couple of hits of marihuana. The most obvious problem with the State's position is that no statute permits the instruction on voluntary intoxication when the drug merely aggravated a defendant's mental illness, but did not intoxicate her.

In its brief, the State argues the marihuana caused the appellant to have a "psychotic breakdown," and the appellant's psychotic episode was triggered by the marihuana. That is not supported by the evidence. Both experts testified in their opinion, the appellant had been in a psychotic episode for about three weeks before the killing. Both agreed marihuana can trigger a psychotic event, but the appellant was already in psychosis. The State's expert testified the marihuana merely loosened the appellant's control of her temper.

Section 8.04 of the Texas Penal Code defines intoxication as the "disturbance of mental or physical capacity resulting from the introduction of any substance into the body." Tex.Penal Code Ann. § 8.04 (Vernon 1974). The intoxicant in this case— two puffs on a marihuana cigarette—did not produce intoxication; by the testimony of the State's own expert, the marihuana merely loosened the appellant's temper.[2] Thus, it was error to give the instruction on voluntary intoxication.

The majority relies on two of the cases permitting the instruction on voluntary intoxication over the defendants' objections, *Jaynes v. State*, 673 S.W.2d 198, 200 (Tex. Crim.App.1984), and *Williams v. State*, 567 S.W.2d 507, 508 (Tex.Crim.App. [Panel Op.] 1978). In both cases, the defendant claimed to be intoxicated and did not remember having committed the act resulting in the indictment. In *Jaynes*, the defen-

that the jury, properly charged, must decide. Tex.Penal Code Ann. § 8.01 (Vernon Supp.1993).

**2.** The marihuana was merely one of the events that may have precipitated the appellant's action. As a paranoid schizophrenic who was in a psychotic state, almost anything could have set

her off—the vacant lot they passed, which scared her, after which she told her daughter she was going to kill her; the "twisty" pepper plants, the chickens that refused to lay eggs, or the blooming hibiscus.

dant, intoxicated on alcohol and drugs, drove her vehicle into another, injuring a person standing nearby. *Jaynes*, 673 S.W.2d at 199. The defendant, who was charged with failing to stop and render aid, testified she remembered nothing about the accident; the last thing she remembered was driving around with a friend. *Id.* at 200. In *Williams*, the defendant went on a drinking spree, imbibing a combination of beer and whiskey, and at 10:30 a.m., he shot at a number of people. Later, when he sobered up, he voluntarily went to the police station where he was told about the shootings. *Williams*, 567 S.W.2d at 508.

Neither *Jaynes* nor *Williams* is relevant to the present case. Here, the appellant, who remembered killing her child, was not intoxicated. The appellant testified she had two puffs of a marihuana cigarette somewhere between one to three hours before she killed her child.[3] Five people saw the appellant after she killed her child: the three police officers, the justice of the peace, and her common-law husband. None said she appeared to be intoxicated. Further, the chemist from the Brazoria County Crime Lab testified no drugs were detected in the blood sample taken from the appellant at the time of her arrest.

In cases where the issue of intoxication is present, before the trial court is authorized to give the instruction on voluntary intoxication, there must be proof of two things: (1) the defendant must have used a significant amount of the intoxicant; and (2) the defendant must have appeared intoxicated. In the following cases, the trial court refused to give the instruction on voluntary intoxication because there was no evidence the defendant appeared intoxicated. In *Nethery v. State*, 692 S.W.2d 686, 711 (Tex.Crim.App.1985), even though the defendant drank three "kamikaze" drinks and shared a marihuana cigarette

before the shooting, the defendant did not appear to be intoxicated. In *Still v. State*, 709 S.W.2d 658, 659, 661 (Tex.Crim.App. 1986), even though the defendant drank about a case of beer and some whisky during the afternoon, he did not appear to be intoxicated, because he could describe his awareness and the events leading up to the shooting. In *Schenck v. State*, 624 S.W.2d 757, 758 (Tex.App.—Fort Worth 1981, no pet.), even though the defendant was under the influence of drugs (Valium and Etrifon) and alcohol (two six-packs of beer), the defendant was not entitled to the instruction, because he did not attribute his anger to the intoxication.

In this case, the instruction on voluntary intoxication unfairly shifted the burden to the appellant and prejudiced her defense of insanity. The State had the burden to prove murder, which the appellant did not contest. The appellant had the burden to prove she was insane, which she was required to prove by the preponderance of the evidence. When the State introduced evidence that she had two puffs of a marihuana cigarette, coupled with the instruction that intoxication is no defense, it shifted the burden to the appellant to prove the marihuana did not cause her mental condition.[4]

The appellant should be given a fair opportunity to present her defense of insanity, without having to disprove the implication that she is responsible for her mental condition by voluntary action. I would reverse and remand for retrial because of error in the charge.

---

3. The appellant shared a marihuana cigarette with her common-law husband sometime between 5:15 p.m. and 7:35 p.m., as she drove from Houston to Rosharon with him. The appellant killed her child about 8:15 p.m.

4. In most cases involving the use of an intoxicant, when a defendant attempts to prove she is not responsible for the crime because she did

not have the proper culpable mental state, the defendant is attempting to prove the intoxicant changed her normal mental condition. Here, because of the charge on voluntary intoxication, the defendant was required to prove her defense of insanity **and also** prove that the intoxicant did **not** change her normal insane condition.