TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-03-00191-CR
NO. 03-03-00192-CR




Larry Ralph Elliott, Appellant

v.

The State of Texas, Appellee





FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
NO. 02-256-K277 & 02-257-K277, HONORABLE KEN ANDERSON, JUDGE PRESIDING


 
M E M O R A N D U M O P I N I O N


                        On January 15, 2002, appellant Larry Ralph Elliot drove his truck into a grocery store,
killing one woman and seriously injuring another. He was indicted for murder and aggravated
assault. See Tex. Pen. Code Ann. §§ 19.02 (West 2003), 22.02 (West Supp. 2004-05). On February
13, 2002, a jury found appellant incompetent to stand trial but likely to regain competence with
treatment. On January 13, 2003, another jury was empaneled to re-examine appellant’s competency
and, after a hearing, found appellant competent to stand trial. On February 3, trial began before a
third jury, and appellant pleaded not guilty by reason of insanity. The jury found appellant guilty of
both counts, sentencing him to life imprisonment for the murder and twenty years’ confinement for
the assault. On appeal, appellant contends that the evidence is legally and factually insufficient to
support the finding that he was competent to stand trial and that the evidence is factually insufficient
to support the rejection of his insanity defense. We affirm the judgments of conviction.

Competency to Stand Trial
                        In his first and second issues on appeal, appellant contends that the evidence is legally
and factually insufficient to support the jury’s finding that he was competent to stand trial.

Standard of Review
                        A person is incompetent to stand trial if he either lacks a sufficient present ability to
consult with his attorney with a reasonable degree of rational understanding or lacks a rational and
factual understanding of the proceedings against him.


 Tex. Code Crim. Proc. Ann. art. 46B.003(a)
(West Supp. 2004-05). A defendant is presumed to be competent unless proved otherwise by a
preponderance of the evidence. Id., art. 46B.003(b). However, once a defendant has been
adjudicated incompetent, the burden shifts to the State to prove beyond a reasonable doubt that the
defendant has regained competence to stand trial. Arnold v. State, 873 S.W.2d 27, 30 (Tex. Crim.
App. 1993); Manning v. State, 730 S.W.2d 744, 748 (Tex. Crim. App. 1987). 
                        When the State bears the burden in a competency hearing, we review the factual
sufficiency of the evidence supporting a finding of competence by asking whether, considering all
the evidence in a neutral light, the jury was rationally justified in finding competence beyond a
reasonable doubt. See Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004) (discussing and
clarifying standard of review applied to beyond-a-reasonable-doubt burdens of proof). The evidence
may be insufficient if evidence of competence is too weak to support a finding of competence when
viewed alone or if evidence of incompetence is so strong that the beyond-a-reasonable-doubt
standard could not have been met. Id. at 484-85. Evidence may “preponderate” in favor of
competence but still be outweighed by contrary proof and thus be factually insufficient under the
beyond-a-reasonable-doubt standard. Id. at 485.

Factual Summary
                        The parties agree that appellant suffers from paranoid schizophrenia, dating back at
least to 1988 or 1989. Dr. Michael Jumes was Chief Psychologist of the North Texas State
Hospital’s


 Competency Restoration Program when appellant was admitted to the hospital after
being found incompetent in February 2002. Jumes testified that while at the hospital, appellant
received treatment that included medication, formal training to help him understand court
procedures, stress management, and classes to help him understand his medical condition and
medications. Jumes testified that appellant made substantial progress and, as of April 24, 2002, was
legally competent and displayed an understanding of the difference between felony and misdemeanor
charges, the possible ranges of punishment, the consequences of being found guilty, and basic legal
concepts like use of evidence, plea bargains, and the roles of juries, judges, and attorneys. Appellant
was discharged on May 17, 2002. Jumes testified that a person can slip in and out of competence,
which is why Jumes recommended that appellant receive continuing psychiatric services.
                        Dr. Mary Anderson was appointed by the trial court to evaluate appellant’s
competency. She saw appellant five times, first in late January 2002 and, most recently, shortly
before the January 2003 competency hearing. Anderson testified that in January 2002 appellant was
having severe symptoms such as a high degree of paranoia, which led him to refuse to eat because
he believed his food was poisoned, and intense auditory hallucinations on which he was very
focused. Although appellant factually knew what the situation was and who the various people were
in the courtroom, he could not interact in a reasonably coherent way due to his distracting auditory
hallucinations. Anderson testified that appellant’s symptoms had since lessened and, although
appellant still reported hearing voices, he understood that “the voices were coming from his head,”
and Anderson believed he was competent to stand trial in January 2003.
                        The State also called Annette Hawkins, who oversees the medical department of the
Williamson County Sheriff’s Department. Hawkins testified that appellant’s records show that while
in jail after his hospital discharge in May 2002 he had received and taken his medications as
prescribed.


 Finally, the State introduced a letter written on May 2, 2002, by Dr. Thomas Wiman,
Competency Program Psychiatrist for the North Texas State Hospital, stating that it was his opinion
that appellant was competent to stand trial.
Discussion
                        Appellant asserts that no rational jury could have found beyond a reasonable doubt
that he was competent to stand trial, arguing that, except for Dr. Anderson, the doctors had not
examined him recently enough to prove that he was currently competent. We disagree. Although
Jumes and Wiman formed their opinions in late April and early May 2002, their opinions were
relevant in determining whether appellant had responded to competency treatment. Anderson
testified that she saw appellant for about an hour the week before the competency trial in January
2003. Based on that and her other examinations of appellant, Anderson opined that appellant was
competent. Jumes believed appellant could maintain competency with medication and psychiatric
care, and there was evidence that appellant had continued to take his prescribed medication. We
hold that the State met its burden and that the evidence is both legally and factually sufficient to
support a finding, beyond a reasonable doubt, that appellant had regained his competence and was
competent to stand trial. We overrule appellant’s first and second issues on appeal.

Sanity at the Time of the Offense
                        In his third issue, appellant contends that the evidence is factually insufficient to
support the jury’s rejection of his insanity defense.

Standard of Review
                        Insanity is an affirmative defense to prosecution. Tex. Pen. Code Ann. § 8.01(a)
(West 2003). When a defendant asserts an affirmative defense, he bears the burden of proof on that
issue, and in reviewing the evidence supporting a jury’s finding on an affirmative defense, we
consider all of the evidence and determine whether the judgment is so against the great weight and
preponderance of the evidence as to be manifestly unjust. Zuniga, 144 S.W.3d at 482; Bigby v. State,
892 S.W.2d 864, 875 (Tex. Crim. App. 1994). A defendant pleading insanity who has not already
been adjudicated insane has the burden of proving by a preponderance of the evidence that he was
insane at the time of the offense. Manning, 730 S.W.2d at 748; see Tex. Code Crim. Proc. Ann. art.
46.03, § 1(c) (West Supp. 2004-05).
                        A person is considered legally insane if, as a result of a severe mental illness, he did
not know at the time the offense was committed that his conduct was wrong. Tex. Pen. Code Ann.
§ 8.01(a). Medical insanity is distinguishable from legal insanity and a person may be medically
insane, yet still be able to distinguish right from wrong and thus be legally sane. Taylor v. State, 856
S.W.2d 459, 468 (Tex. App.—Houston [1st Dist.] 1993), aff’d, 885 S.W.2d 154 (Tex. Crim. App.
1994) (citing Graham v. State, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978)). The question is not
whether a defendant knows his act was “morally” wrong, but is whether he “understood the nature
and quality of his action and whether it was an act he ought to do”; in other words, whether he knew
the act was wrong by societal standards. Bigby, 892 S.W.2d at 878. 
                        The determination of whether a defendant was legally insane at the time of the offense
is an issue “exclusively within the province of the jury,” and it is for the jury to determine the weight
and credibility of witness testimony and to determine whether to accept or reject all or any part of
the opinion testimony given by experts and other lay-witnesses. Taylor, 856 S.W.2d at 468; see
Graham, 566 S.W.2d at 952; see also Aschbacher v. State, 61 S.W.3d 532, 537 (Tex. App.—San
Antonio 2001, pet. ref’d) (jury acted reasonably in its resolution of conflicting evidence as to
defendant’s sanity); Sanders v. State, 771 S.W.2d 645, 649 (Tex. App.—El Paso 1989, pet. ref’d)
(jury is sole judge of weight and credibility to be given conflicting expert testimony).

Factual Summary
                        The parties agree that appellant suffers from paranoid schizophrenia and has delusions
that people are trying to take his land and stop him from owning horses and that several doctors had
in the past conspired against him, rendering him sterile and implanting in his teeth microphones that
broadcast his thoughts. Appellant has suffered from his mental illness since at least 1987 and
eventually had to stop working and go on medical disability leave. In the fall of 2001, appellant’s
doctor, Dr. James Kreisle, began changing appellant’s medication because appellant was suffering
from side effects and his symptoms were returning. To effect the drug change, Kreisle gradually
decreased the dosage of the old medication, called Serentil, as he increased the dosage of the new
drug, called Seroquel.
                        Michael Williams was present when appellant drove his truck into the grocery store. 
Williams described appellant’s demeanor after the offense, saying that appellant seemed dazed and
expressionless, “like he had just gotten in trouble. I mean like a kid that just got caught or something
with his hands in the cookie jar or whatever. He just kind of stood there, you know, like he had done
something wrong.” A second witness described appellant as having a “blank look on his face.” A
third witness said that after the incident, appellant calmly admitted to being the driver. In an
interview with police officers after the offense, appellant stated he was going to the store to buy
groceries when he “snapped.” He said he did not know what happened, did not know why he was
upset, and did not remember driving into the store. He said, “I guess I must have just went crazy. 
That’s all I know.” Appellant told the police that he had schizophrenia and had regular doctor
appointments because he “was hearing voices” that were trying to take his property. Asked what
made him angry, he said, “Somebody did something to me and my life is over with.” He also told
the police that he was afraid to sleep. One of the interviewing officers testified that he believed
appellant remembered more than he admitted and was ashamed of what he had done.
                        Psychiatrist Dr. Richard Coons testified that he examined appellant the day after the
offense. He also reviewed appellant’s medical records, records and statements about the offense,
and appellant’s police interview. He testified that he believed appellant was legally sane at the time
he committed the offense. Coons testified that appellant felt that he had been harmed by doctors and
others, grew angry, could not figure out a solution, and committed “an angry general act,” driving
into the store. Coons said that this “generic act of anger” was combined with appellant’s delusions,
but he did not believe appellant was unable to understand that his act was wrong. In other words,
appellant knew his action was wrong, but his anger overwhelmed him; Coons compared appellant’s
act to getting in a fight or breaking something and regretting it later. Coons said appellant’s failure
to consider consequences is not an inability to understand right and wrong. Coons also testified that
he did not believe appellant was unable to think things through and stated that an urge to exact
revenge for imagined harm does not equate to insanity. Coons pointed to appellant’s statements—
that he knew he had “messed up,” that he had stopped himself from acting on violent urges in the
past, and that he had decided not to hit a police officer because he would get in trouble—as showing
that appellant “recognized the ramifications of doing those violent acts and decided against them.” 
Coons said it appeared that appellant “had an irresistible impulse and acted on it,” noting that the
irresistible impulse concept had been removed from the insanity statute about twenty years earlier.


 
Coons testified that, even if appellant’s medications were not effective when he committed the
offense, he still would have known that it was wrong to drive into the store. Coons believed
appellant’s act, though “not highly thought out,” was intentional.
                        Dr. Anderson, the court-appointed psychiatrist, testified that she examined appellant
five times and reviewed some of his medical records, police reports, and his police interview. 
Anderson agreed that appellant suffers from a severe mental illness but testified that he nonetheless
knew his conduct was wrong and that he was sane at the time he committed the offense. She based
her opinion on statements by appellant that: he felt remorse for committing the offense; if he had
thought about it he would have controlled himself; he knew it would be wrong to kill the doctors he
believed had conspired against him; someone would stop him, and he would get in trouble if he tried
to bring a weapon to an appointment with one of the doctors; and he “wanted to go after” those he
believed had harmed him but “didn’t know how to do it” or how “to get away with it.” Appellant
told Anderson, “I made a mistake. Instead of going after somebody that done me wrong . . . I just
made a mistake. . . . I wasn’t thinking and went in the wrong place.” Anderson testified that
appellant said he was angry at the time of the offense, and she believed that when he said he
“snapped,” he meant that he acted on his anger. Appellant told Anderson that if his mother or the
police had been present, he would not have committed the offense. Anderson summarized her
opinion as follows: “I think he was mentally ill; and I think he knew that hurting somebody was
wrong; and I think he knew driving into the store was wrong.” 
                        Psychiatrist Dr. Scott Murry testified on appellant’s behalf. Murry treated appellant
while he was in jail a total of seventeen times; the first session was on January 23, 2002. Murry
testified that some sufferers of paranoid schizophrenia believe they are hearing voices and cannot
be talked out of that belief. Schizophrenia is treated through medications that are supposed to stop
sufferers from hearing voices, allow them to give up their delusions, and help with concentration and
organization. Murry testified that if a person stopped taking his medications, he would expect
auditory hallucinations and other symptoms to return. He also stated that long-prescribed drugs
sometimes lose effectiveness over time. He testified that a patient’s eating, sleeping, and bathing
less, worrying and acting agitated, and having “a general going downhill perception,” could indicate
the return of auditory hallucinations or paranoia.
                        Murry testified that he believed that on January 15, 2002, appellant “was unaware that
his actions were wrong” and that he was statutorily insane when he drove his truck into the grocery
store. Murry came to that conclusion because appellant said he was not thinking about potential
consequences and did not think anyone would get hurt; he did not realize what had happened until
he was already inside the store; he did not know how the truck stopped; he only went to the store for
groceries; he did not think anyone was inside the store; he was uncertain as to why he was arrested;
he did not know the difference between being charged with a crime and being committed to a
psychiatric hospital; the worst consequence he could think of was losing his driver’s license; and he
should have attacked the doctors he believed had harmed him rather than driving into the store. 
Murry viewed the videotape of appellant’s police interview and was struck by appellant’s “lack of
insight into his role and what had occurred.” Appellant seemed shocked, surprised, and saddened
that there had been any injury associated with his actions. Murry also testified that appellant’s use
of the word “snapped” was meaningful because any of us, overwhelmed by stress, “could, in fact,
snap and take actions without our own awareness.” Murry admitted that his sessions with appellant
were treatment-related and not aimed at determining appellant’s legal sanity. 
                        Appellant took his medication about 9:00 p.m. on January 14. He was arrested
immediately after committing the offense and did not receive any medication on January 15. Murry
testified that appellant’s symptoms of schizophrenia were probably worse on January 16, after
missing his medication on the 15th. He believed that appellant had at least “a sane moment” on
January 16, the day after the offense, when he was interviewed by Dr. Coons and stated that he felt
bad and knew he “messed up.” Murry believed that appellant was sane on January 30, when Murry
saw appellant for the second time. Murry testified that people can lapse in and out of sanity,
depending on factors such as stress or medication levels.
                        Psychiatrist Dr. Joel Feiner reviewed appellant’s medical records and his interview
with the police and interviewed appellant and his parents. Feiner believed the Seroquel did not have
the same level of control as the Serentil, resulting in a return of delusions and hallucinations “in a
much more dramatic and pervasive way.” Feiner thought Kreisle should have maintained appellant’s
Serentil levels until the Seroquel was built up to an adequate level and should have monitored
appellant more closely, rather than seeing appellant every four months during the transition in
medications. Feiner testified that appellant’s use of the word “snapped” was significant and meant
that “there was a period of unknowing, where he was oblivious.” Feiner testified that he believed
appellant did not know that his conduct was wrong at the time he drove his truck into the store. He
testified that appellant was insane when he committed the offense and that he believed appellant was
under-medicated, which allowed his delusions and external stressors to cause him to snap. Feiner
also believed that shortly after the incident, appellant was “jolted into realizing what he had done,
and at that point may have realized that it was wrong”; he testified that people can lapse in and out
of sanity very quickly. Feiner did not think it was possible to separate a personality trait that desired
revenge from “the pervasiveness” of appellant’s mental illness, stating, “[T]he idea that there is a
personality acting independent of the illness to me is a myth.” Feiner did not think appellant’s anger
was independent of his delusions and that “all [appellant] had in his mind at [the time of the offense]
were delusions.” Feiner stated under cross-examination that he had reviewed many of appellant’s
records and “formed an opinion and had a mandate from” defense counsel before he met appellant
for the first time.
                        Psychiatrist Dr. Stuart Crane interviewed appellant the day after the offense and spoke
to Dr. Kreisle and appellant’s mother. After speaking to appellant, Crane switched appellant from
Seroquel to a drug called Risperdal because he, like Dr. Feiner, did not believe the prescribed
Seroquel was “an effective dose.” Crane testified that Dr. Anderson’s knowledge of Seroquel
dosages “at best was seriously out of date.” Crane stated that on January 16 appellant was suffering
from paranoid delusions but did not give an opinion as to appellant’s sanity because he is not a
forensic psychiatrist and did not feel qualified to do so. 

Discussion
                        Appellant argues that he showed by a preponderance of the evidence that he was
legally insane, pointing to testimony by Drs. Murry, Feiner, and Crane that his medications were not
effective and that he was in the throes of his delusions. Additionally, Murry and Feiner testified that
appellant did not know right from wrong when he committed the offense. However, Drs. Coons and
Anderson testified to the contrary, stating that they believed appellant knew his conduct was wrong. 
Coons believed that appellant acted on his angry feelings, pointing out that even if appellant felt an
uncontrollable impulse to act on his violent urges it did not mean he was legally insane. Both
doctors testified that appellant made statements that led them to believe he knew his act was wrong.                        All of the doctors agreed that appellant suffers from a serious mental illness, but there
was a difference in opinion as to whether he knew right from wrong at the time of the offense. It was
for the jury to hear the evidence and determine whether appellant was legally insane. See Graham,
566 S.W.2d at 952; Taylor, 856 S.W.2d at 468. We will not second-guess the jury’s determinations
on matters of credibility or weight to be given witness testimony. See Aschbacher, 61 S.W.3d at
537; Sanders, 771 S.W.2d at 649. Two doctors testified that they believed appellant was insane
when he drove his truck into the grocery store. However, two doctors testified that they believed
appellant was legally sane when he committed the offense. The evidence is factually sufficient to
support the jury’s rejection of appellant’s insanity defense. We overrule appellant’s third issue.
 
Conclusion
                        Having overruled appellant’s issues on appeal, we affirm the judgments of conviction.
 
 
                                                                        __________________________________________
                                                                        David Puryear, Justice
Before Chief Justice Law, Justices Patterson and Puryear
Affirmed
Filed: April 14, 2005
Do Not Publish